[Civ. No. 7014.  First Appellate District, Division One.—September 12, 1930.]

THE JOHN BREUNER COMPANY (a Corporation), Respondent, v. THE WESTERN UNION TELEGRAPH COMPANY (a Corporation), Appellant.

Pillsbury, Madison & Sutro, Francis R. Stark, Homer Brockett, Alfred Sutro and Eugene M. Prince for Appellant.

Ernest L. Brune and Gavin McNab, Schmulowitz, Wyman, Aikins & Brune for Respondent.

PARKER, J., *pro tem.*—Defendant appeals from a judgment in favor of plaintiff in an action for money had and received by defendant to and for the use of plaintiff. The case was tried upon an agreed statement of facts. The main facts thus agreed upon may be narrated.

The plaintiff is a California corporation with its office and principal place of business in the city of San Francisco and John Breuner is and was at all of the times herein referred to the president of the said corporation. The defendant is a corporation engaged in the business of a telegraph company, throughout the United States, and is engaged in interstate commerce. John Breuner was not known to defendant or to any of its employees and in December of 1925 the said Breuner left San Francisco on a trip to New York and on the twenty-ninth day of January, 1926, was in New York, staying at one of the hotels in that city. On this last-stated date an impostor, fraudulently using the name of John Breuner, sent a telegram by Western Union from New York City to the Breuner Com-

pany of San Francisco, which telegram was received by the said company and which read as follows:

"Going to Atlantic City, N. J., today—will return Monday—send all wires to me there care WU stop Wire one thousand dollars to me today care of above address very urgent.

"JOHN BREUNER."

On the same day one W. D. Knights, duly authorized to act on behalf of the Breuner Company, went to a telegraph office of the defendant and deposited there the sum of one thousand dollars with an agent of defendant, authorized to receive the same, with the request that the said amount be forwarded to John Breuner at Atlantic City, New Jersey. The application for transfer of the money was in writing and was written upon the standard form used by the Telegraph Company for such purposes and said application was by the Breuner Company. At the time of the application the agent of the defendant asked the representative of plaintiff if he desired to have the payee positively identified and drew the attention of said representative to the provision of the transfer blank which waived identification unless expressly signed and it was explained that if the forwarding company desired the payee positively identified before payment of the transferred money, the provision noted must be signed. Plaintiff's representative then inquired as to what identification would have to be produced by the payee if the sender did not sign the requirement for positive identification and he was told that the company's agent at the paying office would ask of the claimant certain questions as to the person and place he was expecting the money from and the amount thereof, which questions would have to be answered satisfactorily. The plaintiff's representative then signed the application but did not sign the positive identification clause, deposited the money and was given a receipt, reading as follows:

"Received from John Breuner Co. one thousand and No/100 dollars, to be paid to John Breuner at Atlantic N. J. subject to the terms and conditions of money transfer of this date," which receipt was duly executed with a notation of charges paid. The one thousand dollars was transferred to Atlantic City as required by the order and application of plaintiff on the same day. At about 9 o'clock P. M. of

said date some person calling by telephone from New York rang up the Western Union office in Atlantic City. He inquired about a money transfer for John Breuner and said that he desired to have the same forwarded to Orange, New Jersey. After a general conversation wherein the party telephoning gave such information as was outlined in the statement of the agent at San Francisco, the money was forwarded from Atlantic City to Orange and on the thirtieth day of January a person representing himself to be John Breuner called at the Orange office and received the money. We deem it needless to detail the manner of identification or the sufficiency thereof at the Orange office for the reason that it is conceded throughout this action that the defendant company was not negligent or derelict in so far as the matter of sufficiency of identification may be concerned under the terms of the transfer contract. Suffice it to say that, from the record, the person to whom the money was paid did sufficiently and minutely identify himself to be John Breuner, though it has transpired that the means of identification were fraudulent and false. It might be further noted that Atlantic City and Orange are widely separated and in no sense correlated as suburbs of a common city or otherwise. Further, Atlantic City seems to be a seaside resort of national repute, patronized throughout the year, and about 137 miles southwest from New York City. Orange is a place of less renown and about fourteen miles west of New York City, being practically a suburb of Newark, N. J., and can be reached from New York by many different means, including rail transportation and busses and similar conveyances. As a further fact it was stipulated that on or about February 1, 1923, the defendant Telegraph Company adopted and caused to be printed and it issued to all of its money transfer offices throughout the United States its eleventh edition of its book of rules of money transfer instructions to its agents and employees. Said book was in use at all times herein mentioned by all telegraph money transfer offices, but said book was not shown the representative of the Breuner Company nor referred to in any manner and the said representative had no actual knowledge of the book of rules or any of the contents thereof. In the stipulation is the reservation, that the question of plaintiff's constructive knowl-

edge remains open for debate and determination. Likewise was it stipulated as to the existence and use of a tariff book by the defendant Telegraph Company.

The eleventh edition of the book of rules referred to provides that in the transfer of moneys no positive identification of the payee shall be required unless by written demand of the sender this positive identification is specifically ordered. It may be noted that originally the rule was just the reverse, namely, that unless positive identification was waived, it would, in all cases, be required. The book of rules was not filed with the Interstate Commerce Commission at Washington on or before January 30, 1926, although the previous edition, being the tenth edition, had been filed with said commission and was on file on January 30, 1926.

By way of complete statement of the stipulated facts it may be that the form of the transfer was as follows:

"(After date)

"Pay to John Breuner, care of Western Union Telegraph Co., Atlantic City, New Jersey, One Thousand Dollars.

"Signed   JOHN BREUNER Co.

"281 Geary St."

Printed in red letters, as distinguished from the printing in black on the remainder of the transfer message, are these words: "Positive evidence of personal identity is NOT to be required from the payee, and I authorize and direct the telegraph company to pay the sum named in this order at my risk to such person as its agent believes to be the above named payee, UNLESS the following is signed." What is referred to as "the following" is a demand for positive identification and was not signed. As might be inferred, the party sending the original request for money was not John Breuner, president of plaintiff corporation, and the money paid at Orange was not paid to John Breuner, president of plaintiff corporation.

On these facts the trial court gave judgment that the plaintiff recover from the defendant Telegraph Company the sum of one thousand dollars.

■ As pointed out the complaint was in the common count for money had and received. According to the theory of respondent, and it is supported by general authority, this form of complaint is all-embracing. Under it the plaintiff, it is contended, may establish any cause of action,

whether sounding in contract or tort, or arising out of fraudulent representations or breach of promise to marry. As long as the facts indicate that defendant is under some moral or equitable obligation to pay money to the plaintiff, the complaint is sustained. While many minds might differ on the question as to the scope of recovery permissible under the common count, it can be definitely stated that plaintiff is not entitled to recover hereunder merely because, summing up all of the facts, it might appear expedient or generally fair that some recompense be afforded for an unfortunate loss. Equity, in its broadest sense, hardly goes that far.

Accordingly, admitting the necessity of establishing some ground of recovery, the plaintiff, respondent, supports the judgment on the theory of a combined breach of contract and negligence in the said breach. It is conceded here that the actual payment was not negligent, and in so far as the manner of payment goes, no claim for relief is based thereon. The respondent's position is that the Telegraph Company, by the terms of its contract, was bound to deliver the money to the transferee at Atlantic City, and not elsewhere; that when the Telegraph Company undertook to forward the money to Orange, from that time on it was acting at its own risk and liable for any payment made to a party not entitled to receive the money. And, incidental to this contention, is the further contention that the forwarding of the money to Orange was an act of gross negligence on the part of the defendant Telegraph Company. In sustaining this contention respondent argues that the entire contract between the parties consisted of the application for a money transfer and the receipt given.

Appellant, on the other hand, contends that the contract, as evidenced by the application and receipt, was and should be construed only with reference to the rules and regulations of the defendant company, as admittedly existing. We are of the opinion that the authorities support the contention of the appellant in this respect. Preliminarily certain facts may be taken as undisputed; that the defendant company is a telegraph company, rendering a nation-wide public service, under the regulation of the Interstate Commerce Commission, which cannot be denied; that this service is rendered in accordance with approved tariff and ser-

vice regulations adopted by the Telegraph Company, as embodied in defendant's book of rules for money transfer service. While the book of rules referred to in the stipulation of facts was the eleventh edition, in the particulars noted it differed in no respect from the tenth edition and this last-named edition was on file with the Interstate Commerce Commission. Further, it may be noted that filing with the commission is not a prerequisite to the rules taking effect. (*Western Union Tel. Co.* v. *Esteva Bros. & Co.*, 256 U. S. 566 [65 L. Ed. 1094, 41 Sup. Ct. Rep. 584].)

█ Under the authorities hereinafter cited it is our conclusion that the rules of service are an inseparable part of the public service regulated and to be rendered, and that when one contacts or contracts with such public servant the rules governing necessarily become a part of the contract from which neither of the parties may deviate. Rates of public service must be uniform, and it must follow that to secure uniformity of rate there must be included within the rate a uniformity of service.

█ Respondent argues that, admitting the service to be regulated and controlled by the rules, nevertheless one dealing with the Telegraph Company is not presumed to know the rules and is not chargeable with any knowledge thereof. This contention is likewise fully answered in the cited cases and to the contrary of the claim made by respondent. It would tend rather to cripple and render useless the public need and service if the matter of regulation were made a personal element of contract in each transaction. And if we were to engage in presumption in each individual case, the harm resulting would affect all parties. By way of illustration, if it should have been the case that the party in the instant case should have been the real John Breuner who telephoned to have the money forwarded and the Telegraph Company should have refused the transfer on the ground that the receipt and application constituted the entire contract, and from such refusal damage accrued to John Breuner, we feel safe to state that the Telegraph Company could not support a defense predicated upon the claim that the rules were not made known to Breuner. And to put the public service dependent upon the proof of actual knowledge of every rule properly adopted as regulatory of the service would eventually narrow and restrict the utility

to limitations seriously hampering its efficiency. (*Western Union Tel. Co.* v. *Esteva Bros. & Co., supra; Cultra* v. *Western Union Tel. Co.,* 44 I. C. C. 670, 61 I. C. C. 541; *Davis* v. *Henderson,* 266 U. S. 92 [69 L. Ed. 182, 45 Sup. Ct. Rep. 24]; *Davis* v. *Cornwall,* 264 U. S. 560 [68 L. Ed. 848, 44 Sup. Ct. Rep. 410].)

■ From the foregoing it is manifestly our conclusion that when plaintiff delivered for transfer the funds in question, it did so mindful of the rules of service adopted by the defendant Telegraph Company and that these rules entered into and became an integral part of the contract. This conclusion is adopted at the strong insistence of the defendant and appellant Telegraph Company, and, in so far as this branch of the case is involved, is the main support of the appeal, being dependent, however, as a ground of reversal, upon evidence that there was a compliance with these rules.

■ Coming then to the rules of service relied upon. The defendant Telegraph Company has provided, in the said rules, for cases where transfers of money may be forwarded or relayed from one paying office to another. Under the title heading "Forwarding Transfers to New Paying Office," we find a number of subdivisions relating to such transfers and the requirements and procedure necessary. The first general section, numbered 109, reads as follows:

"Transfers may be forwarded by telegraph to a new paying office, or transfer drafts may be forwarded by mail, at the request in writing of the payee."

Under the same general title is the subheading: "Forwarding by Telegraph," being the first subheading in the title and but two sections numerically from the section quoted.

Section 111, under the subheading, reads: "The request may be made at the original paying office by the payee in person, properly identified, or from a distant point by paid message or otherwise, before the expiration of the 72 hour cancellation limit specified in these Rules."

Appellant and respondent differ as to the construction of the rules quoted. Appellant contends that section 109 should be construed as limiting the words "at the request in writing of the payee" to the transfer of drafts by mail;

while respondent as earnestly argues that the phrase limits the entire section.

In construing section 109 we have little aid from specific authority. However, there are general rules of construction, and the simplest and primary one is that words are to be construed in their ordinary meaning. Obviously the correlation of words and the construction of the completed sentence have likewise a deciding control as to the meaning intended. Further, the mechanical construction employed serves to disclose the meaning intended. Taking all of these factors into consideration, we are of the opinion that the phrase ''at the request in writing of the payee'' limits the entire section. If we should adopt the construction of appellant, we would have the provision for transfers by telegraph without limitation of any sort. Then the right and power to transfer from the original paying office would be arbitrary and without regulation. In other words, a money transfer directed to New York, with no reason given or request made, could be transferred to Omaha. Such a rule would be unthinkable, and the sense of this section would not survive under the construction of appellant. It might be noted that all payments of money transfers are by transfer drafts and when the draft is issued technically the transfer is complete though there may have been no actual delivery of the money transferred.

The distinction between the transfer and the transfer draft seems merely a distinction between paying offices. Money is transferred from San Francisco to New York, for instance. The payee may, under the rules, desire the payment to be made at New York, but does not want the money delivered there. It may be that he has an address in some near by and less accessible place and prefers that the draft, through which payment is made, be mailed to him. In the other instance the payee may have departed New York and desires, for purposes of quick delivery, that instead of making out a draft with the delay incident to mail, the money transfer be forwarded to a new paying office. In either case, under the rule as we interpret it, a written request must be made and in both cases the necessity for such a rule is equally urgent.

Appellant urges that the construction to be placed upon section 109 limiting the necessity of a written request to

the transfer drafts is demonstrated by the language of section 111. Under this latter section, under the subheading "Forwarding by Telegraph," it provides: *"The Request* may be made at the original paying office by the payee in person, properly identified, or from a distant point by paid message, *or otherwise,"* etc. It is argued that, irrespective of any former provision, this particular section is all-controlling as to the procedure on forwarding transfers of money. Again we reach a stage of construction with ample light to guide us. ■ In the construction of a statute, or a private writing, it is a cardinal rule that all parts are to be construed with reference to each other, and when a conflict appears, the general provisions yield to those specific. This rule is invoked, however, only where there is an apparent lack of harmony between the provisions. Its effect is not to isolate parts and attempt to build up a conflict which in fact does not exist. Having in mind the general purport of the entire body of rules, and especially those as to the handling and transfer of money, we note an expressed and definitely outlined policy of caution, irrespective of the waiver of positive identification. These two sections (109–111) should be read together and as though comprising but one paragraph. From the context it is manifest that if the two were thus in one section the words *"The Request"* would, without hesitation, be held to qualify the request before noted, namely, a written request. The separate paragraphing makes no difference in the reading of the provisions. It does not seem reasonable or logical that in a body of rules bristling with warning signs directing a safe course of handling money entrusted to the company's agents, it could be intended that a transfer of money would be so without rule or guidance as the loose construction of the term "otherwise" would indicate. A public service company, doing business in every section of the world through agents, would require written authorization in its every step to protect against liability and against claims fraudulently conceived. And it cannot be foreseen how such a service could be more greatly disorganized than by holding that where on contracts for the transmission of money from one city to another the meaning of this contract is that the funds may be delivered to any locality in the world at the discretion of the agent at the original pay-

ing office without record or writing. ■ It is our conclusion, therefore, that in the instant case it was the contract of the defendant Telegraph Company to deliver to John Breuner at Atlantic City the funds entrusted to said Telegraph Company and that as a part of the said contract the company could, upon written request of John Breuner (without positive identification), forward the money to a new paying office. The contract was breached on the part of the defendant. It is strenuously argued by appellant that, granting a breach of the contract for the purposes of argument entirely, nevertheless the money was paid to the person at whose instance it was sent and the fact that plaintiff was deceived by the impostor into sending the money affords no reason for putting the loss on defendant, in the absence of fault by the latter. At the outset, we may note that the premise is not altogether undisputed as to the question of fault. Breach of contract is in some degree a fault and one having thus erred cannot claim to be entirely blameless. The arguments of both plaintiff and defendant on this phase of the case have elements of convincing persuasion. Appellant urges that irrespective of means of transfer, or respect for rules, the transfer was made in complete accord with the intent and purpose of the undertaking, namely, to deliver to the impostor the actual money that respondent intended this impostor should receive. Respondent concedes that if the payment had been made to the impostor at Atlantic City that it would then have no cause of action against defendant. Here again respondent affirms its position as standing strictly on the contract of transfer. Further arguing that irrespective of the amount or degree of care that may have been exercised, the fact that the contract for the delivery of the money was breached renders defendant liable for any loss that may have resulted. We do not feel inclined to adopt this strict construction. As a matter of analysis, and under the admissions of respondent, the breach occurred not in the essence of the contract but in the manner of performance. If the money had been paid to the true John Breuner even at Orange, New Jersey, or in Hoboken, it is undisputed that plaintiff would have no cause of action. For the purposes of extreme accuracy, however, we omit from the last statement the question of damages resulting from delayed delivery.

The answer to the argument of no recovery upon payment to the true Breuner is that there was no damage or could be no damage shown. So here we narrow the issue down to the question of what damage resulted from defendant's breach or the contended negligence arising wholly from the breach in payment at original paying office.

█ It must be evident, in approaching a solution of the issue, that the general intent of the respondent in the transaction was the delivery of money to the identical person who first initiated the entire affair in the sending of the original request. The fraud began there. The plaintiff then said to defendant in effect: "Here is one thousand dollars; deliver the same to John Breuner at Atlantic City and you will use your own best judgment to be reasonably sure that the person to whom delivery is made is John Breuner." Respondent concedes, as stated, that defendant did deliver the money to such person and in the delivery made strict compliance with the request. The object of the transfer had been accomplished and here again respondent concedes that if the same delivery to the same person under the same circumstance had been made at Atlantic City, no recovery could be had.

Throughout the entire body of the law, both of contract and negligence, we find the principle repeatedly announced that to warrant recovery against a defendant there must be shown some causal connection between the act or omission complained of and the loss or injury. In the case of *Brown* v. *Rives,* 42 Cal. App. 482 [184 Pac. 32], the action was against a notary public upon his official bond. It appeared that one Canfield had forged the name of the owner of real property to a deed conveying the property to one Rabild, a name assumed by Canfield for the purpose of perpetrating the fraudulent conveyance. Then, as Rabild, he appeared before the notary who placed upon the deed his acknowledgment certificate attesting the signature of Rabild. The grantee under the fraudulent deed, having parted with his money, brought the action on the notarial bond. The District Court of Appeal held that the notary was without blame inasmuch as his certificate was truthful, under the facts. The Supreme Court, upon application for a hearing before it, sustained the conclusion of the District Court, but solely upon the ground that the certificate of the notary

was not the proximate cause of the damage. Agreeing that without the notarial certificate the deed could not have been recorded, that without recordation no transfer could have been complete under the escrow, both courts concluded that the act of the notary had not worked the injury of which plaintiff complained. The reasoning of the court was that the grantor had nothing to convey and therefore the form of his conveyance was immaterial.

So here, it may be said that, according to the intent and purpose of the contract, the place of delivery was not a proximate cause of the damage nor did it proximately contribute thereto. The argument of respondent on this phase of the case is highly hypothetical. For instance, it contends that we must assume, in the absence of evidence, either that the true Breuner was well known in Atlantic City or that the impostor was so well known there as to render impossible the impersonation. It is argued, along these same lines, that it may have been that the plaintiff suspected the fraud and had officers present at Atlantic City to apprehend the impostor and for that reason he caused the transfer to be forwarded to Orange, thus frustrating the plan. This argument falls of its own weight for two reasons: First, it is highly speculative and unfounded in fact; second, if that were the case, the duty of plaintiff would have been clear, namely, to forthwith notify defendant company and stop payment. Without continuing, it seems apparent to us that the changed place of payment, under the facts of this case, was not the proximate cause of plaintiff's loss.

In the recent case of *Ryan* v. *Bank of Italy*, 106 Cal. App. 690 [289 Pac. 863, 865], which was a case involving payment of funds pursuant to check, the court says: ''Moreover, it was the intention that the check should be delivered to and endorsed by the person who executed the deed. Nor is there any distinction in principle between cases where the check is delivered to the impostor in person and where such delivery is made through an intermediary if the drawer causes it to be delivered to him in the belief that he is the person to whom or upon whose indorsement it will be paid.'' (Citing cases.) The views herein announced find complete support in the following cases: *Western Union Tel. Co.* v. *Kidd*, 22 Ala. App. 597 [118 South. 228];

*Western Union Tel. Co.* v. *Meyer*, 61 Ala. 158 [32 Am. Rep. 1]; *Western Union Tel. Co.* v. *Bank,* etc., (Tex. Civ. App.) 277 S. W. 226; *Wilson Co.* v. *Adams Express Co.*, 27 Mo. App. 360.

In none of the cited cases is involved the question of payment at a new paying office, yet the principles therein announced have easy application to the questions here discussed.

In *Land Title Co.* v. *Northwestern Bank,* 196 Pa. 230 [39 Am. St. Rep. 717, 50 L. R. A. 75, 46 Atl. 420], we find this language: ''In such a case the intention with which the drawer issued the check has been carried out. The person has been paid to whom he intended payment should be made. There has been no mistake of fact, except the mistake which was made when he issued the check, and the loss is due, not to the bank's error in failing to carry out his intention, but primarily to his own error, into which he was led by the deception previously practiced upon him.''

It is useless to cite further cases. Respondent concedes the principles, but stoutly and with much reasoning maintains that it has no application, once the contract is breached.

We come back to the exact point from which we started. We have adopted the principle announced as applicable in its full vigor to the instant case and we again affirm that respondent, having shown no damage from the breach and having failed to establish the connection in any proximate degree between the breach and the loss, it cannot recover. Therefore, it is our conclusion that the judgment should be reversed and it is so ordered.

Tyler, P. J., and Cashin, J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on October 11, 1930, and a petition by respondent to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on November 10, 1930.