## Davis v. Western Union Telegraph Company

*Louis R. Oppenheim* and *Arnold W. Hirsch*, for plaintiff.

*David I. McAlister* and *Charles G. Sweet*, for defendant.

CUMMINS, J., October 22, 1954.—Plaintiff brought a civil suit in assumpsit against defendant before

Alderman John F. Carmichael, now deceased. The amount involved was $250 and judgment was found for plaintiff in that amount. Defendant appealed the alderman's judgment to the court of common pleas, where after the filing of a complaint, an answer raising new matter and a reply, the taking of a deposition in the State of California and a pretrial conference, in accordance with a stipulation of counsel, the matter was tried by the court without a jury.

This case was continued several times because of the illness of McAlister & Oppenheim, original counsel, now deceased, and to permit the attendance of Dr. Phillip Davis, a medical student. Most of the continuances granted in this case were by argument of counsel. Since the trial final action on this matter by the court has been delayed by the failure of counsel in filing their briefs on the law as requested by the court.

It is undisputed that on August 1, 1945, plaintiff, A. L. Davis, received in Monongahela, Pa., what purported to be a Western Union telegram from his son, Phillip Davis, indicating that Phillip was about to be discharged from the Marine Corps, and asking that $250 be wired to Phillip in care of Western Union, at Riverside, Calif. Plaintiff, who knew that his son was stationed near Riverside, Calif., went to the Charleroi, Pa., office of defendant, Western Union Telegraph Company, Inc., and there gave $250 plus $3.39 transmittal fee to one Lucille O'Rourke, an employe of defendant, and directed that the money be transmitted to Riverside, Calif., and paid over to Phillip Davis. The money was transmitted to Riverside, Calif., and, according to the deposition of one of defendant's employes was there paid over to a person who represented himself to be Phillip Davis, presented a Marine Corps identification card that was the card issued to Phillip Davis and endorsed a money order with the name Phillip Davis. This payee was an impostor, to

date unapprehended. Investigating action by defendant and by naval authorities showed, inter alia, that the real Phillip Davis had neither sent the telegram requesting money nor received payment of the $250. It also appeared that Phillip Davis' Marine Corps identification card had been stolen shortly before the occurrence of the events described above.

Among disputed matters in the testimony was plaintiff's claim that he intended to insist on positive identification of his son, a privilege that could be requested on defendant's money order application blank, but that this intention was ignored by defendant's agent, as was a description of certain physical characteristics of Phillip Davis which plaintiff desired to have transmitted as a positive method of identification; this testimony of plaintiff was denied by defendant's agent.

Also disputed were plaintiff's contentions that he was not permitted to fill out the Western Union money order blank and that the order was transmitted prior to plaintiff's having paid for it.

Plaintiff testified that on August 1, 1945, he was in his store in Monongahela and a Mrs. Bostleman delivered a telegram to him which read as follows:

"Mr. Davis, 424 West Main Street, Monongahela, Pennsylvania. Wire Two Hundred Fifty and no/100 ($250.00) Dollars in care of Western Union to Riverside, California. Am leaving for home Thursday morning. Am discharged and am staying home for good. Phillip Davis." Plaintiff told the bearer of the telegram that he would give her the money if she would be responsible for it, to see that his son received the money and she would not accept it and told him to take it to the office at Charleroi, Pa. Plaintiff went to the office of Western Union at Charleroi, Pa., and told the clerk that he had a son in service who had been injured; that he was six foot three and that she should send this with his description and it should not be turned over to any

other person. He gave her $250 and she gave him a receipt for it. He asked her what the charges were for sending the telegram and she told him $3.39. He discovered for the moment he didn't have enough money to pay this fee and he started out of the office to get some money and said to the clerk: "Just a minute; I am going out to get a check cashed or something, and I will pay you." He signed a money order in blank before he left. Plaintiff testified further that when he asked her, before leaving, what the price was for the money order she said to him: "Now, you sign the name down and we will fill out the rest," and he said no, he did not want to do that. He said also he wanted to fill in the blank himself. She suggested to plaintiff that he pay the $3.39 to the agent at Monongahela, Pa., but plaintiff refused. Plaintiff said he walked out of the office and then discovered he had sufficient money to pay the fee and he came back, and said to the clerk, "I have the money to pay for it and I want that form if you could fill out the description". She replied that she had sent and signed the application. Plaintiff said he did not authorize her to do this and requested the clerk to stop payment of the money in question.

It is admitted by counsel for the parties that plaintiff has demanded $250 from defendant company and defendant company has refused to pay the same.

Plaintiff admitted on cross-examination that he did not write any information for a test question on the application blank and that he did not send any message to be delivered with the money. He also testified on cross-examination that when he came back from outside the clerk had already sent the money and he wanted to see the application blank and the clerk would not show it to him. He said also that they wanted him to sign some kind of a form and he refused because the money had already been sent.

Lucille O'Rourke, an employe of defendant company

testified that plaintiff came into the office on August 1, 1945, and that he filled out the payee's name on the money order and that he said nothing to her about positive identification and that he had an opportunity to read the application. She said plaintiff asked her how long it would take to send the money and she replied an hour or so. Plaintiff did not put down any test question to ask the payee and did not sign for a test question. She testified further that he was short of change and went out for 10 minutes to get this and when he came back she had sent the money order. She said further she had given him a receipt for the money order before he left the office to find more money, and that plaintiff had talked to her about his son, but she did not understand that this information was to go in the application blank.

From a review of the briefs filed by counsel for the parties, it appears that plaintiff contends that defendant company was negligent in its dealings with plaintiff in not complying with his instructions when he sent his son this money and as a result thereof he is out of pocket the amount in question. It must be remembered at this point that plaintiff has sued in assumpsit and not in trespass and that no fraud, accident or mistake has been averred by plaintiff.

Defendant company claims that plaintiff had the opportunity to require personal identification at the other end and did not do so. To support their position they introduced the tariffs filed with the Federal Communications Commission defining the two types of telegraphic money order, the deposition of the paying clerk, Phillip Roselle and the oral testimony of the receiving clerk, Lucille O'Rourke.

The Western Union money order application used by plaintiff in this case, contained the following:

"Positive evidence of personal identity, is not to be required from the Payee, and I hereby authorize and

direct the Telegraph Company to pay the sum named in this order at my risk to such person as its agent believes to be the other named payee, unless the following is signed. Positive identification required. I desire the above named payee shall be required to produce positive evidence of personal identity before payment is made."

The question before the court is, should the court give judgment for plaintiff in the amount for which the suit is brought?

Since the proceeding is in contract it becomes necessary for us to review the contract between the parties. It presents an opportunity for the customer (plaintiff) to send money either "Caution or Vigilant". Where identification is waived the money order is denominated "caution" and where it is not the order is known as "vigilant". In the case at bar the money was sent "caution".

It is the position of defendant that since plaintiff did not sign the form and he sent his money at the "caution" rate instead of the "vigilant" rate that he waived positive identity at the other end.

We agree with the position taken by defendant and cite the following authorities:

In the case of Western Union Telegraph Company v. Kidd, 118 So. 228 (1928), an Alabama case, a plaintiff who had received a request in the name of his son, then being discharged from the Army, wired money to the boy at Oakland, Calif. At the Oakland end the person who had sent the message to the company for money called for it and showed discharge papers. Here, as in our case, an impostor received the money. A portion of the opinion is quoted:

"A theory of the defense was that at the time these money transfers were made the defendant had blank application forms, setting forth the provisions and regulations under which the transfer of money would

be undertaken. These forms, provisions, and regulations had been filed with and approved by the Interstate Commerce Commission in accordance with the Interstate Commerce Act. These blank application forms were used in this case. On the face of them appeared the following provisions:

" 'Positive evidence of personal identity is not to be required from the payee, and I authorize and direct the telegraph company to pay the sum named in this order at my risk to such person as its agent believes to be the above named payee, unless the following is signed:

" 'Positive Identification Required.

" 'I desire that the above-named payee shall be required to produce positive evidence of personal identity before payment is made.

" 'Signature. . . . . . . . . . . . . . . . . . . . . . . . . '

"It is asserted by defendant that by reason of plaintiff's failure to attach his signature to the provision for positive personal identity of the payee, the waiver provision applied; was, by reason of the act, a part of the contract between the parties. Plaintiff's reply to this defense was that at the time he negotiated these money transfers defendant's agent furnished him no blanks to be filled out; that he (plaintiff) was ignorant of the quoted provision; that when he inquired of defendant's agent if there was anything for him to sign, said agent told him there was not, and thus deprived him of any opportunity to stipulate for positive personal identity of the payee."

As can be seen, this case raised the same issue as the Davis case. It was held that the company was not liable even though this person turned out to be an impostor.

Another similar case is John Breuner Company v. Western Union Telegraph Company, 108 Cal. App. 243, 291 Pac. 445 (1930). In this case an impostor

sent a message to plaintiff asking that $1,000 be sent to him at Atlantic City, using the name of the president of the corporation. A company employe wired the president the money. Plaintiff's representative signed the application for the money order, but did not sign the positive identity clause. Just as in our case also, a blank bore the words:

"Positive evidence of personal identity is not to be required from the payee, and I authorize and direct the telegraph company to pay the sum named in this order at my risk to such person as its agent believes to be the above-named payee, unless the following is signed."

The Breuner case is complicated by the fact that the company paid the money at Orange, N. J., instead of Atlantic City, and a good deal of the opinion is taken up in disposing of this contention. Judgment for plaintiff in the lower court was reversed by the Supreme Court of California in a case far stronger for plaintiff than the case at bar.

Gilliam v. Western Union Telegraph Company, 27 Ga. App. 383, 108 S. E. 553 (1921), is another one which is even stronger for the Western Union Company than our case. In Gilliam plaintiff let the agent fill out the application for him in its entirety. The agent did not sign the application for positive identity on behalf of the sender. The Georgia court found that this was sufficient to waive the requirement of positive identity. The Georgia court holds:

". . . and where such application contains a waiver, on the part of the applicant, of identification of the payee of the money at the office at the point where the payee is to receive it, and authorizes and directs the telegraph company to pay the sum named in the order at the applicant's risk, and to such person as the company's agent believes to be the payee named in the application, the applicant is bound thereby."

The Georgia court went on to relieve the company of negligence. This opinion is all syllabus and evidently plaintiff sued in trespass, too.

First National Bank of Dothan v. Western Union Telegraph Company, 142 So. 99 (1932), is also an Alabama case. The facts are about the same as in the previous three cases. The court held that the fact that the telegraph company's agent directed the sender how to fill out the application for the money order providing waiver of personal identity of the receiver unless a certain blank was signed, did not waive or estop the telegraph company from pleading the waiver provision. The wording of the telegraph blank was the same as in our case. The Alabama court said in part:

"From the decisions which we have read on this subject, and which are collated in 10 A. L. R. 828 et seq., it would appear that the liability of a telegraph company growing out of the delivery of money to a person who had sent a telegram requesting the forwarding of money centers about the acceptance and forwarding of the forged telegram. If there appears nothing unusual or suspicious about the sender, and the money is returned in response to the message, without a demand for specific identification, a payment of the money to the sender is a complete discharge of the obligation of the telegraph company."

On page 102 the court went on further to say:

"The proposition advanced in plaintiff's replication that the ignorance of plaintiff's agent of the rules and regulations of the defendant and the act of the defendant's agent in directing plaintiff's agent how to fill out and sign the application for the money order constituted a waiver or estoppel on the part of the defendant to set up its regulation regarding waiver of identification is not well taken. It is only necessary to refer to the case of Western Union Telegraph Co. v. Prevatt, 149 Ala. 617, 43 So. 106, 108, where a Mrs. Cason,

defendant's agent, wrote out a message for a person who could neither read or write, and where the defendant relied upon the failure of the plaintiff to file his claim for damages within the stipulated time. In that case this court said:

" 'That Mrs. Cason in writing the message, notwithstanding she was the agent of the company, was acting for and on behalf of the sender, cannot well be denied. In the preparation of the message, she was acting as the agent of the sender. While she was the agent of the company to receive and forward messages, she was not such agent to write messages for others. When specially requested by the plaintiff to do this work for him, she was as such his agent, as if he had been a stranger to her. When one writes a message upon one of these blanks, or procures another as his agent to write it for him, and signs the same, or procures his agent to sign his name to it, without dissent, he will, in the absence of fraud be estopped from denying the binding force of such regulations on the message as to which we have referred, notwithstanding he did not read them. He will not be permitted to show that he did not read or understand the conditions contained in the printed regulations. Western Union Tel. Co. v. Edsall, 63 Tex. 668, citing Gray's Communications by Telegraph, 52, note 2; White v. Western Union Tel. Co. (C. C.) 14 F. 720, 722, notes "n" and "v".' "

"In the absence of any allegation of negligence or bad faith on the part of this defendant, there can be no recovery under the contract set out in the pleadings."

Western Union Telegraph Company v. Cosby, 99 S. W. 2d 662 (1936), a Texas case, is another which has come up on the same fraud. The same wording was present on the telegraph blank. The only difference in the facts is that here the impostor called the paying

party on the telephone and for some reason plaintiff in the suit is the intended payee rather than the payor. For that reason the case is not a square holding on our proposition, although the court dismissed the lack of standing of plaintiff as a superfluous objection. The Texas court said in part:

"(1) Under the record as presented to us, we believe there was no issue of fact to be submitted to the jury. The sender having waived positive identification of the payee, and plaintiff in error's agent having used the extra precaution which her testimony conclusively shows she did use to identify the payee, plaintiff in error has fully discharged its duty, and the record fully discloses that plaintiff in error exercised ordinary care in paying the money to the person who received it. There is no evidence in the record tending to show that the person to whom the money was actually paid was not in truth and in fact named E. R. Cosby.

"(2) We believe the following cases are fairly in point and support the conclusions reached by us: Gilliam v. Western Union Tel. Co. 27 Ga. App. 383, 108 S. E. 553; First National Bank of Dothan v. Western Union Tel. Co., 25 Ala. App. 108, 142 So. 99 writ refused, 225 Ala. 38, 142 So. 102; Western Union Tel. Co. v. American State Bank of Burkburnett (Tex. Civ. App.) 277 S. W. 226; Land Title & Trust Co. v. Northwestern Nat. Bank, 196 Pa. 230, 46 A. 420, 50 L. R. A. 75, 79 Am. St. Rep. 717, in which the principle is laid down that, where two innocent parties have been deceived, the loss must be borne by the one who primarily made such loss possible."

Several of the telegraph cases refer to Land Title and Trust Company v. Northwestern National Bank, 196 Pa. 230 (1900), reargued 211 Pa. 211 (1905). This was not a telegraph case, but is represents an analogy which has moved several courts outside Penn-

sylvania in deciding cases of this nature. We submit it here in some detail because in the view of counsel for defendant this is the closest analogy which the law of Pennsylvania affords. In that case a confidence man named Ashley, representing himself as Dr. Bissey by false representation, procured a check from the Land Title and Trust Company to the order of Dr. Bissey. Ashley then endorsed this check to the Northwestern Bank who collected the money from the Land Title and Trust Company. The Land Title and Trust Company sued the Northwestern Bank for repayment. This is like our case. The impostor (name to us is unknown) by his wire persuaded Mr. Davis (who is in the position of the Land Title Bank) to pay money to the Western Union Company (which is in the position of the Northwestern Bank). The Western Union Company paid the impostor. Therefore, when the Land Title Bank sued the Northwestern Bank it is the same problem as when Mr. Davis sues the Western Union. It was held by the Supreme Court of Pennsylvania that the Land Title Bank could not recover from the Northwestern Bank. It follows that Mr. Davis cannot recover from the Western Union. The holding seems to be that:

"A bank is not liable for the payment of a check on a forged indorsement where the person who committed the forgery and received the money was in fact the person to whom the drawer delivered the check, and whom he believed to be the payee named."

This applies to our case because the intention with which he, the drawer of an order upon Western Union, issued the check has been carried out. The person has been paid to whom he intended payment should be made. There has been no mistake of fact except the mistake which he made when he bought the money order to "Phillip Davis" and the loss is due not to any Western Union error in failing to carry out his inten-

tion, but primarily to his own error into which he was led by the deception previously practised upon him.

10 C. J. S. 1089 §494(b) states the rule on impostors in bill and notes which is to the effect that the drawer of a check, draft or bill of exchange who delivers it to an impostor supposing him to be the person whose name he has assumed must as against the drawee or bona fide holder bear the loss, where the impostor obtains payment of or negotiates the same. Western Union here is like the drawee—Mr. Davis, the drawer who directed payment to "Phillip Davis", the impostor.

The Corpus Juris Secundum reference hereinabove is apparently copied almost verbatim from the head note of North Philadelphia Trust Company v. Kensington National Bank, 328 Pa. 298 (1938), which held what the head note said it did. The North Philadelphia Trust Company case was said by the Supreme Court to be identical with the facts in the Land Title and Trust case, supra, and is ruled by it. In Real Estate Land Title and Trust Company v. United Security Trust Company, 303 Pa. 273 (1931), the Supreme Court said (page 278) :

"The characteristic feature of these cases was . . . that the money was in fact paid to the person to whom plaintiff by its actions showed it intended the money should be paid."

In another case, Land Title Bank and Trust Company v. Cheltenham National Bank et al., 362 Pa. 30 (1949), the Supreme Court termed this line of cases cited hereinabove as the so-called impostor cases, defining such as those "which hold that a bank is not liable for the payment of a check on a forged endorsement where the person who committed the forgery and received the money was in fact the person to whom the drawer delivered the check and whom he believed to be the payee named".

From the above it is apparent that the original Land Title and Trust Company case, (i. e., the one at 196 Pa. 230), which was discussed at some length hereinbefore is not an isolated case, but is the first of a series of cases representing a well-settled rule of law in Pennsylvania. It is interesting, although probably not logically relevant, to note that this will still be the law under the Pennsylvania Uniform Commercial Code. See section 3-405(1)(a) and Pennsylvania Banks and the Uniform Commercial Code, 1954, page 122, section entitled "Fictitious Payees". See also Pennsylvania Annotations to Uniform Commercial Code (1953).

It is immaterial that the impostor posed through the mail in one of these cases: Market St. T. & T. Co. v. Chelten Trust Co., 296 Pa. 230 (1929):

"Where a bank, intending to draw a check in favor of a person to whom it was indebted, in fact draws it to the order of another, to whom it sends the check, and afterwards pays its amount to an innocent holder thereof, it cannot recover back from the latter the sum so paid."

In a New York case which seems to be rather frequently cited in the literature on this subject, Hartford v. Greenwich Bank, 142 N. Y. S. 387 (1913), there is a fairly clear exposition of the rule. Here a defrauder persuaded the A. & P. Tea Company to make out checks to a fictitious party, James Wilson, for alleged business never transacted. In setting forth the law on this transaction the New York court said:

"The checks were paid to the very person to whom the Tea Company intended they should be paid, viz., the person from whom it believed that it had purchased goods. It is true that it had never received any goods from the person in whose favor it drew the checks, and that it had been cheated into believing that it had so bought them, but it is very clear that no liability can attach to the bank for that fraud. Having, however,

been cheated into the belief that it had purchased goods from and owed money to one James Wilson, it intended when it uttered the check that it should be paid to the person from whom, as it then believed, it had made the purchase. That person was the identical person to whom the checks were paid. This is not strictly speaking the case of a check drawn to a fictitious or non-existent person. There was an actual person, calling himself James Wilson, although that was not his real name, and it was that person to whom the Tea Company intended its checks should be paid. It would serve no useful purpose to cite at length the many cases dealing with the liability of banks for wrongfully paying out their customers' funds."

Mr. Davis obviously intended the Western Union to pay the money to the "Phillip Davis" at the other end of the line who had sent him the first telegram requesting money. No doubt the defrauder in California who duped this old gentleman received the money and has obviously made good his swindle. Hence it follows, although perhaps regrettably, that the person for whom the money was intended received it.

It is a frequently cited and almost elementary principle that as between two innocent parties the loss must rest upon him who by his carelessness or negligence first gave credence to the artifice and thus makes possible the perpetuation of the fraud: States v. First National Bank of Montrose, 203 Pa. 69, as quoted in Land Title and Trust Company, supra. Here Mr. Davis was the person first duped—who first gave credence to the artifice—and who set afoot the chain of events which caused the loss.

An interestingly similar problem was presented to the Supreme Court of the United States in Western Union Telegraph Company v. Esteve Bros. & Co., 256 U. S. 566 (1921), 65 Sup. Ct. 1094, and decided in an opinion written by Mr. Justice Brandeis. This case

came out of a suit against the telegraph company to recover damages for a mistake in the transmission of cablegrams.

By error the company delivered a message directing a sale of 2,000 bales of cotton when the original message had been for 200 bales of cotton. At that time on cablegrams there were two kinds of messages, unrepeated messages and repeated messages. Naturally the repeated messages cost more, but if the customer paid the rate for the repeated message, he was at least entitled to have the company liable in case of mistake for up to 50 times the amount of the extra charge. If the customer sent an unrepeated message, the blank said on it that the company was not liable except for the price of the cablegram.

This double standard of prices and liability was set forth in tariffs filed with the Interstate Commerce Commission just as in our case the difference in effect, and the rates for "Caution" and "Vigilant" money orders were filed with the Federal Communications Commission. (The relevant portion of these tariffs are in evidence). The Supreme Court held two things: (1) That the customer was bound by the filed tariffs even though he did not have actual knowledge of their contents; (2) that the customer having chosen the unrepeated rate by paying the toll charge for the unrepeated rate was held to the consequences of his election. The Supreme Court said:

"Since the limitation of liability was in the nature of contract, the provision had to be brought home to the sender of a message in order to be legally binding upon him. Assent by the sender was ordinarily established if the message was written upon one of the company's blanks which set forth the limitation of liability."

Later in the opinion Justice Brandeis said:

"If the general public upon paying the rate for an

unrepeated message accepted substantially the risk of error involved in transmitting the message, the company could not, without granting an undue preference or advantage extend different treatment to the plaintiffs here. The limitation of liability was an inherent part of the rate. The company could no more depart from it than it could depart from the amount charged for the service rendered."

When the Esteve case is placed alongside the facts of the case at bar, the analogy is plain. When Davis elected a "Caution" money order by failing to sign the place on the blank and failing to furnish the information for a test question in writing on the blank in the place provided, he accepted the limitation inherent in a caution telegraphic money order.

There seem to be two fairly good analogies in the law, wholly apart from the cases on telegraphic litigation, which can shed some light on the question before the court here. Reference is made to: (1) Cases involving delivery to impostors by common carriers, and (2) cases involving the delivery of negotiables to impostors which we have already covered. In Wilson & Company v. Adams Express Co., 27 Mo. App. 360, two men named F. H. Davis lived at La Cynge, Kans., one a reputable business man, the other a swindler. Plaintiff received an order for cigars signed F. H. Davis, but it knew no one by this name. Through the usual commercial channels it learned that a man by that name was of good credit in La Cynge and accordingly shipped the cigars. Defendant delivered the goods to the swindler, who had placed the order. Plaintiff brought suit for misdelivery and recovered judgment, which was reversed, the court saying at pages 369, 370:

"It is contended in the case at bar, as it was in the case cited, that plaintiff intended to send the goods to the other party, but the fact is, as was remarked in

the case cited, he intended to send them to the man who ordered them, supposing erroneously that he was the other man. The truth of the whole matter is, that plaintiff shipped the goods on the order of, and to, the man to whom the defendant delivered them. That he was mistaken as to who that man was, is a misfortune which he ought not, in justice, to be allowed to unload on the shoulders of defendant."

One Pennsylvania case on this topic deals by coincidence with the delivery of a shipment of cigars: Seibert vs. Railway Company, 15 Pa. Superior Ct. 435 (1900). Here Seibert shipped cigars to A. W. Bell, 55 Liberty Street, New York. There were two A. W. Bells in New York doing business; one was of good standing, the other was not. The railroad company told the one in good standing that the cigars were there, but received reply that the goods were not intended for it but that another concern of the same name was doing business on another street and to look for them. Then the bill of lading was presented by the impostor, to whom it had been sent by the shipper. The railroad company delivered the goods to the man to whom they were sent (that is to say, the impostor who had initiated the transaction and who had deceived the shipper).

The head note of our Superior Court case reads:

"A common carrier is not chargeable for negligence in the delivery of goods where it appears that it delivered them to the man to whom they were sent, and who, the company was induced, by the acts of the shipper in dealing with him, to believe, was the man to whom the shipper intended to send them."

See also Fulton Bag & Cotton Mills v. Hudson Navigation Co. (S. D. N. Y.), 157 Fed. 987 (affd. 4th C. C. A. 164 Fed. 1022) ; Kimbrough v. American Railway Express Co., 168 Ark. 444, 270 S. W. 518, 519; Myers v. American Railway Express Co., 243 Mass.

390, 137 N. E. 654; Samuel v. Cheney, 135 Mass. 278. The principal laid down in the foregoing cases involving common carriers is even more forcefully applicable to cases involving telegraphic transfers of money. In the carrier cases there may sometimes be a doubt as to the fundamental intention of the shipper, but in our money order cases there can be no such question as the customer is given a deliberate choice between two kinds of service.

The brief filed by plaintiff's counsel is a well prepared one but it is concerned with negligence.

We said heretofore that the thing to remember in this action is that it is a case in assumpsit and any inquiry apart from that action is not material.

The Dryberg case, which he cites for the burden of a carrier, later goes on explicitly to hold, "it is enough that negligence is charged and proved". In this case the agent sent a different message than the customer had written and the court stated that his negligence "was more apparent and inexcusable".

The Marab, Lapenna and Totten cases are negligence cases, in which negligence was pleaded and an issue of negligence sufficient to take the case to the jury proved.

In the Marab case the court charged "that the defendant must be proved guilty of negligence"; in the Lapenna case the court said, "if through want of ordinary care appellant paid the money to an impostor, it is liable", and in the Totten case it was held "that payment without inquiry raised the question whether or not the operator exercised reasonable care".

In each of these cases a specific act of negligence by the company's agent was alleged and proved.

The Bailey case which he has cited starts out, "a telegraph company is liable in tort to the addressee for injuries arising out of the *negligent* transmission of an intelligible message".

In the Parrill and First National Bank cases, Parrill is on the duties of a common carrier of cows to keep them from being burned. The bank case is on the duty of supervisors who have received some money from the bank in an ultra vires manner to return it, notwithstanding the invalidity of the note given when the money was borrowed. We cannot see the analogy.

In the Meyer case, it is one where circumstances put the company on inquiry and it was held "that since there was nothing to create the suspicion in the mind of the operator, the duty to ascertain (genuineness) was on the addressee."

From a careful review of all the evidence in this case and the briefs filed by counsel for the parties, we conclude that defendant is entitled to a verdict at our hands; plaintiff having no case, in the law here applicable.

In consideration of the above, we make the following

*Order*

And now, October 22, 1954, we find for defendant, Western Union Telegraph Company, Inc.