THE STATE OF NEW JERSEY, BY GROVER C. RICHMAN, JR., ATTORNEY-GENERAL OF THE STATE OF NEW JERSEY, PLAINTIFF-APPELLANT, v. THE WESTERN UNION TELEGRAPH COMPANY, DEFENDANT-RESPONDENT.

Argued November 8, 1954—Decided December 20, 1954.

*Mr. Charles J. Kehoe* argued the cause for appellant (*Mr. Grover C. Richman, Jr.,* attorney).

*Mr. Augustine A. Repetto* argued the cause for respondent (*Messrs. Bolte and Repetto,* attorneys).

The opinion of the court was delivered by

WILLIAM J. BRENNAN, JR., J.    The Superior Court, Chancery Division, dismissed the State's complaint which sought to escheat, under *N. J. S.* 2A:37–1 *et seq.,* the amounts of telegraphic money orders originating more than 14 years ago at defendant's New Jersey offices which were not taken up by the payees at the places of destination nor refunded to the senders.   The trial judge held that the relationship obtaining between the defendant and the sender of the telegraphic money order is not one of trust but of debtor and creditor, subject to the bar of the statute of limitations. The State's appeal is here upon certification of our own motion.

If the transactions between the senders and the defendant created debts, and not trusts, there was nothing to be escheated.   Under the rule followed in this State there is no escheatable property in a chose in action upon which all remedy has been barred by the statute of limitations. *State by Parsons v. Standard Oil Co.,* 5 *N. J.* 281 (1950), affirmed 341 *U. S.* 428, 71 *S. Ct.* 822, 95 *L. Ed.* 1078 (1951). On the other hand, if the more realistic concept of the substance of the relationship is one of trust, the obligations are property subject to escheat.   *State v. United States Steel Corp.,* 12 *N. J.* 38 (1953); *State v. U. S. Steel Company,* 12 *N. J.* 51 (1953).

## I

The defendant's telegraphic money order service has been familiar to the nation for decades, and has long been an important adjunct to defendant's primary business of transmitting telegraphic messages. The advantage of the service and its particular appeal is that it offers a speedy method of transmitting funds from place to place by having one office of the company telegraph another to pay out an amount of money, thus eliminating the delay of sending actual cash or check by mail or other slower means. The company carries on business in all 48 states and the District of Columbia and in foreign countries. The conduct of the business is regulated by the Interstate Commerce Commission and the Federal Communications Commission, as well as by the public-service regulatory bodies of the several states. Defendant handles millions of telegraphic money orders annually under tariff regulations in the form of rules applicable to the telegraphic money order service and filed with and approved by such regulatory bodies.

Whether a trust or a debt is created if one pays money to another in the business of transmitting funds to third persons is said to depend upon the manifested intention of the parties. *State v. U. S. Steel Co., supra; Restatement, Trusts, c. 1, sec. 12, comment g.* This is another way of saying that when the parties have no express understanding as to the nature of their relationship the law will attach the legal consequence from a consideration of their words and conduct in the light of all the circumstances and the customs and usages of the business. Whether or not the parties contemplate that the transmitter of the funds shall be entitled to the unrestricted use of them for its own profit in its business is usually viewed as the controlling factor. If the intention is that the money shall be kept or used as a separate fund for the benefit of the payer or a third person, a trust is created. The mere mingling of the money paid with the transmitter's funds will not of itself compel the conclusion

that the intended relationship was debtor and creditor. *State v. U. S. Steel Co., supra.* Such a conclusion usually results, however, when the court is able to say that the parties intended the transmitter to have the unrestricted use of the money in the carrying on of its ordinary business and to be liable only to pay a similar amount to the depositor or a third person. *Restatement, supra.*

In an illuminating article, *Some Legal Problems Involved in the Transmission of Funds,* 21 *Col. L. Rev.* 507 (1921), Harlan F. Stone, later Chief Justice of the United States, traced the development of the controlling principles from the original concept of the transmitter of funds as either bailee or fiduciary to the modern trend of judicial opinion which stresses the parties' adoption of the customs and usages of the business as the basis for treating persons commercially engaged in transmitting funds as debtors merely of their depositors, absent an express understanding or clear implication from their conduct that the funds are to be held in a fiduciary capacity. Bankers provided a transmittal service for centuries before the invention of the telegraph. Long before equity developed a law of trusts of personal property the law courts allowed an action in detinue for money bailed or an action for account for money received against a banker receiving money for transmittal to another. The transmitter was dealt with, not as an obligor in contract merely, but as a bailee or fiduciary, depending upon whether he undertook to pay over the identical money to the third person or simply to have on hand at all times a specifically identifiable sum of money with the duty to account for it upon an action of account. *Anonymous, Y. B.* 12 & 13 *Edw.* III 244 (1939); *Brand v. Lisley, Yelv.* 164, 80 *Eng. Rep.* 109 (1609); *Sturtevant v. Orser,* 24 *N. Y.* 538 (1862) were actions in detinue; *Rynere v. Frere, Y. B.* 3 *Edw.* III 42 (1310), 20 *Selden* 126, *Robsert v. Andrews, Cro. Eliz.* 82, 78 *Eng. Rep.* 341 (1588); *Harrington v. Deane, Hob.* 36, 80 *Eng. Rep.* 186 (1612), were suits to enforce the obligations by the common law action of account.

With the development of the business of modern banking in the course of which the banker receives the general deposits of his customers and uses them as current funds in his business, being free to use the funds entrusted to him as his own in making loans for his own profit, the English courts early defined the banker's legal relation to the customer as one of debtor and creditor, inferring this intent from the parties adoption of the custom and practice of the business to permit the banker to deal with the funds as his own, and making no distinction between funds received on general deposit and funds received for transmission to another. *In re Barned's Banking Co.,* 39 *L. J. Ch.* 635 (1870); *Williams v. Everett,* 14 *East.* 582 (1811); *Grant v. Austin,* 3 *Price* 58, 146 *Eng. Rep.* 191 (1816).

Some American courts, said Chief Justice Stone, 21 *Col. L. Rev.,* at 510, while adopting this view as to general deposits, rejected it as to funds received for transmission, being influenced by "traditional judicial bias rooted in the history of the subject in favor of holding the receiver of money for transmission to the duties and liabilities of a fiduciary. It is because the legal relationship of fiduciary and principal was worked out by courts of law, through the common law action of account and its successors, debt and *indebitatus assumpsit,* without the aid of equity that we find in modern law a limited class of rights which in point of substantive law are identical with those created in favor of the beneficiaries of a trust by equity, but which unlike trusts may be enforced by an action at law."

But where the custom and practice of the business permits the transmitter to use as his own money entrusted to his care, the permitted use, although consistent with a contractual obligation, is ordinarily inconsistent with the duty of the fiduciary, for which reason, as Professor Scott notes, 3 *Scott on Trusts, sec.* 532, *p.* 2542 (1939):

"The modern trend of opinion * * * is in accordance with the English view; and it is believed that these decisions are more in accordance with the intention of the parties and the customary course of practice in banking."

The rule adopted in the *Restatement on Trusts, supra,* reflects the same conclusion.

New Jersey courts have followed the modern trend of opinion. A company engaged in the business of transmitting funds to foreign countries by cable order has been held to incur a mere contractual and not a fiduciary obligation. *Katcher v. American Express Co.,* 94 *N. J. L.* 165 (*E. & A.* 1920). In that case our former court of last resort held that the transaction according to the ordinary course of business by which the sender paid American dollars to the Express Company at its Newark office for a cable order directed to the company's Russian correspondent to pay 1,000 rubles to a named person in Russia, was "the purchase of a credit available in Russia."

In the instant case the State makes no claim that the obligations sought to be escheated were incurred out of the ordinary course of defendant's business or under any express agreement that the moneys deposited were to be set apart in a separate fund and held as such for the account of the depositors or payees. The analysis of the course of business followed prior to 1938 in defendant's money order service, the details of which have been stipulated by the parties, satisfied the trial judge, as it satisfies us, that the relationship established between senders and the defendant must be deemed to be that of debtor and creditor.

We should note at the outset that the method devised by defendant for the conduct of the money order business has the approval of regulatory bodies, federal and state, which supervise its operation. The approved rules governing the service therefore enter into and become an integral part of the money order transaction. *Western Union Tel. Co. v. Esteve Brothers & Co.,* 256 *U. S.* 566, 41 *S. Ct.* 584, 65 *L. Ed.* 1094 (1921); *John Breuner Co. v. Western Union Telegraph Co.,* 108 *Cal. App.* 243, 291 *P.* 445 (*1st Dist. Div.* I, 1930).

Under the money order procedure followed before 1938 and to this day the sender executes an application form giv-

ing the details as to names and addresses and the amount of the order; he hands the application, with the amount of the order and a sum to pay the charges, to the telegraph clerk; the clerk gives him a receipt, and commingles the cash in the drawer with other cash on hand in the office representing receipts in the message service or from other sources. The cash is used in the daily operations of the office to cash money order drafts presented for payment and to pay payroll and other operating expenses of the office.

The forms of money order application and senders' receipt in use through 1938 were expressly made subject to the conditions printed on the reverse side of the application form. The conditions included a provision that "Domestic orders will be cancelled and refund will be made to the sender if payment cannot be effected within seventy-two hours after receipt · at the paying office  *  *  *"; the other printed conditions refer to the company's duty as an "obligation to effect payment of the money order," limiting the damages payable where payment could not be made through its own offices or in cases of delay, nonpayment or underpayment of the order. These latter provisions are not inconsistent with but tend to show a contractual rather than a fiduciary obligation.

Transmission prior to 1938 was and is now, effected by telegraphic message, partly in cipher, sent by the clerk to the company's money order office nearest the payee. A clerk at that office prepares a money order draft drawn on a fiscal or sub-fiscal agent (there was none in New Jersey through 1938), and notifies the payee that he may take it up. The payee calls at the office of destination where he may either endorse and cash the draft or receipt for it and take it with him. If the payee cannot be located or fails, after notice, to call for the draft within 72 hours the office of origin is notified by telegraph and that office so advises the sender. The sender goes to the office of origin and receives a refund draft, also drawn on a fiscal or sub-fiscal agent,

which he may there endorse and cash or receipt for and take with him.

The transaction from first to last is replete with evidence of a purchase of credit. The sender never sees again or expects to see the currency with which the order is purchased, but only a draft of the company if the order is not paid and he is entitled to a refund. He neither knows nor cares what happens to the cash deposited, but by custom and approved practice looks to the defendant's draft as the method of discharge of the refund obligation. Custom and approved practice also sanction the use by defendant of the funds as its own for the cashing of drafts and the payment of payroll and other expenses in the ordinary course of business and oppose any inference that the deposit was to be held as a separate fund.

█ Records of money order transactions comply with governing regulations prescribing uniform systems of accounts. See Communications Act of 1934, 47 *U. S. C. A., sec.* 220; Interstate Commerce Act, 49 *U. S. C. A., sec.* 20, *par.* (5). See also *N. J. S. A.* 48:2–16. It is enough for present purposes to note that prior to 1938 money order transactions were credited to "Miscellaneous Accounts Payable—Telegram Tranfers," and when not claimed within six months were credited to "Other Non-transmission Revenue" and treated as income. Since January 1, 1943, under a specific regulation of the Federal Communications Commission, defendant has been required to hold the order item open as an account payable for two years, and only if no claim is made within that time is the company authorized to credit the item to "Extraordinary Current Income Credits" and treat it as income. This bookkeeping treatment, although not determinative of the relationship, *State v. U. S. Steel Co., supra,* is consistent with the inference of the debtor-creditor relation to be implied from the custom and approved practice permitting defendant to use the funds as its own and to discharge its obligations by the issuance of its own drafts.

■ Plainly the relation of simple debtor and creditor is perfectly adapted to the custom and approved practice of the business and is the more realistic concept of the substance of the relationship of the parties.

## II.

Defendant is a New York corporation authorized to do business in this State and the unrefunded money orders arose from the business carried on here. Defendant contends, however, that, even should the orders be deemed held on trust, they have no situs in New Jersey under the United States Supreme Court tests of situs as the determinant of state power to escheat intangible personal property within its reach, and are therefore not personal property "within this state" in contemplation of *N. J. S.* 2A:37-12.

Our conclusion that the money order transactions create debts makes unnecessary any decision upon the question, but our uncertainty how the Federal Supreme Court would resolve it from the facts which appear makes some comment appropriate.

The money order applications for orders originating at New Jersey offices through 1938 have been destroyed upon the authority of regulations of the Interstate Commerce Commission and, after 1934, of the Federal Communications Commission. The ledger records of the transactions which are available do not provide for senders' names or addresses or address of payee other than city and state. It would therefore appear that apart from the fact that the company admits the orders were sent from New Jersey offices there is no evidence supporting an inference that the senders were then residents of New Jersey; and, perhaps of more importance, there is no showing at all how long the senders, if resident then, remained residents thereafter.

In *Connecticut Mutual Life Insurance Co. v. Moore,* 333 *U. S.* 541, 68 *S. Ct.* 682, 92 *L. Ed.* 863 (1948), it was held that New York had the power by statute to require foreign life insurance companies to turn over the proceeds of life

insurance policies unclaimed by beneficiaries resident in New York at the maturity of policies issued upon the lives of persons resident there when the policies were delivered and when they matured. The court expressly reserved, however, the question of the validity of the New York statute "in instances where insured persons, after delivery, ceased to be residents of New York or where the beneficiary is not a resident of New York at maturity of the policy. As interests of other possible parties not represented here may be affected by our conclusions and as no specific instances of those types appear in the record, we reserve any conclusion as to New York's power in such situations." 333 *U. S.* at *page* 549, 68 *S. Ct.* at *page* 687, 92 *L. Ed.* at *page* 871.

The fact situation here seems to present a substantive question identical with that reserved by the court. But there is language in the subsequent decision of the United States Supreme Court in *State v. Standard Oil Co., supra,* if intended to have broader application than the situation there before the court, which suggests a holding that there is state power to do what the State is attempting to do in the instant action.

The *Standard Oil Company* case raised the question of state power to escheat shares of stock and unpaid dividends upon stock of a domestic New Jersey corporation. This court upheld the power on the ground that "The sovereignty in which the corporation lives and has its being has dominion over its debtor obligations of this class, through its control of the corporation." 5 *N. J.* at *page* 309. The United States Supreme Court agreed that such property was [341 *U. S.* 428, 71 *S. Ct.* 830] "subject to the disposition of the domiciliary state" and "having been taken * * * by a valid judgment of New Jersey, the same debts or demands against appellant cannot be taken by another state." Mr. Justice Reed's opinion for the majority suggests, however, that the fact that Standard Oil Company was a New Jersey corporation was not the only predicate of state power to escheat intangibles. His expression, equally applicable to a foreign corporation authorized to do business in this State,

implies that the test of state power to seize the debt is simply whether the debtor corporation is amenable to process in a state action in which adequate notice can be given the creditor. He states:

"* * * That power to seize the debt by jurisdiction over the debtor provides not only the basis for notice to the absent owner but also for taking over the debt from the debtor. * * * It is true that fiction plays a part in the jurisprudential concept of control over intangibles. There is no fiction, however, in the fact that choses in action, stock certificates and dividends held by the corporation, are property. * * *
We see no reason to doubt that where the debtor and creditor are within the jurisdiction of a court, that court has constitutional power to deal with the debt. Since choses in action have no spatial or tangible existence, control over them can 'only arise from control or power over the persons whose relationships are the source of the rights and obligations.' * * * Situs of an intangible is fictional but control over parties whose judicially coerced action can make effective rights created by the chose in action enables the court with such control to dispose of the rights of the parties to the intangible. Since such power exists through the state's jurisdiction of the parties whose dealings have created the chose in action, we need not rely on the concept that the asset represented by the certificate or dividend is where the obligor is found. The rights of the owners of the stock and dividends come within the reach of the court by the notice; *i. e.*, service by publication; the rights of the appellant by personal service. That power enables the escheating state to compel the issue of the certificates or payment of the dividends." (341 *U. S.* at *pages* 439–440, 71 *S. Ct.* at *page* 828, 95 *L. Ed.* at *pages* 1088–1089.)

If the test of state power is control over the parties, other states than the domiciliary state may be expected to assert the power to seize the intangibles. And defendant here has been subject to demands by Pennsylvania and Massachusetts in addition to New Jersey and its domiciliary state, New York. The defendant has recognized New York's claim as to money orders originating in New Jersey but only as to orders upon which drafts issued to payees in New York. It has resisted the claims of the other states and apprehends multiple liability if payment is made to or judgment is entered in favor of a state found subsequently not to have jurisdiction to seize the credits.

But on the record before us, if the rights of the defendant were brought within the reach of our courts by personal service upon its authorized agent for process, there is serious doubt whether the State can satisfy the other essential of state power, *i. e.*, adequate notice to the senders by posting and publication. In the *Standard Oil Company* case this court held that "it is implicit in the statute that the notice shall identify the property of which escheat is sought and the *last known owner.*" 5 *N. J.* at *page* 307 (emphasis supplied). This interpretation was a persuasive if not controlling consideration in the finding of the United States Supreme Court that the statute provided for adequate notice and did not deprive the owners of their property without due process of law. 341 *U. S.* at *page* 433, 71 *S. Ct.* at *page* 825, 95 *L. Ed.* at *page* 1085. That case arose under *R. S.* 2:53-21, but the requirement does not differ under the successor statute, *N. J. S.* 2A:37-19. Can the State satisfy the essential of notice to the "last known owners" when the defendant no longer has any records identifying the senders of the money orders and, so far as appears, other evidence of their names and addresses is not to be found?

Affirmed.

WACHENFELD, J., concurring in result.

*For affirmance*—Chief Justice VANDERBILT, and Justices OLIPHANT, WACHENFELD, BURLING, JACOBS and BRENNAN—6.

*For reversal*—Justice HEHER—1.