Jack L. CLAY, Superintendent, Division of Insurance, Department of Business and Administration of the State of Missouri, Respondent,

v.

EAGLE RECIPROCAL EXCHANGE and Missouri Managerial Corporation.

In the Matter of Ralph B. HUTCHINGS and John E. Bell, d/b/a Bell-Hutchings Insurance Agency, Appellants.

No. 49392.

Supreme Court of Missouri.

Division No. 1.

May 13, 1963.

Motion for Rehearing or to Transfer to Court En Banc Denied June 4, 1963.

Lawrence Leggett, the then Superintendent of the Division of Insurance of the State of Missouri, became vested with title in fee to all of Eagle's assets and charged with the duty of acquiring possession of and disposing of them for the use and benefit of Eagle's creditors, policyholders and such other persons having a lawful interest therein, as in said chapter provided. Said superintendent for a time was and his successor in office, Jack L. Clay (thereafter duly substituted as plaintiff), now is the qualified and acting receiver of Eagle; and the Circuit Court of Cole County continues to retain jurisdiction of said cause, to the end that its aforesaid judgment may in all things be enforced within the intent and pertinent provisions of Chapter 375.

Pursuant to the powers vested in him, the receiver, on August 15, 1960, filed a verified motion in said cause, directed against Ralph B. Hutchings and John E. Bell, doing business as Bell-Hutchings Insurance Agency, and who, from January 2, 1958, to May 1, 1958, had engaged in soliciting applications for, collecting premiums on and delivering policies of insurance issued by Eagle, to show cause why judgment should not be rendered against them as in said motion sought.

Count one of the motion alleged that Hutchings and Bell, as such agents, hereinafter referred to as "defendants", had collected and retained premiums in the sum of $4,311.04, which defendants held as trustees for Eagle in a fiduciary capacity and which defendants, after demand, wrongfully had failed and refused to deliver over to receiver, contrary to the provisions of Chapter 375 and certain orders and judgments of the court; and, in the alternative, receiver alleged in count one of said motion that defendants were obligated to pay over to Eagle any and all such premiums even though they or some of them had not been collected; and that defendants were therefore indebted to receiver in the aforesaid sum of $4,311.04,

Goldenhersh, Goldenhersh, Fredericks, Newman & Lane and Samuel J. Goldenhersh and Frank J. Lane, Jr., St. Louis, for appellants.

Charles H. Howard, Jefferson City, for plaintiff-respondent.

HOLLINGSWORTH, Judge.

On May 5, 1958, the Circuit Court of Cole County found Eagle Reciprocal Exchange, hereinafter called "Eagle", insolvent, adjudged that it be dissolved and that its affairs be liquidated in accordance with the provisions of Chapter 375, RSMo 1959, V.A.M.S.[1] As a part of that decree and in accordance with said chapter, C.

1. All statutory references herein are to said revision.

for which sum receiver sought judgment, together with interest from June 16, 1958, and attorney's fees in the sum of $1,500.00.

Count two of the motion alleged that all outstanding Eagle policies had been cancelled by order of the circuit court on May 5, 1958, but that defendants continued to withhold and retain unearned commissions as though said policies remained outstanding; and that, under the terms of defendants' agency agreement with Eagle, defendants were lawfully entitled to retain only the commissions due on premiums earned on such policies up to the date of cancellation by order of the circuit court; and that said unearned commissions amounted to $3,415.86, which constituted trust funds in defendants' hands, and for which defendants were required by law to account and pay over to receiver.

The court sustained the verified motion to show cause why judgment should not be rendered against defendants as prayed therein. Defendants' answer to that order denied the merits of the claims asserted by receiver and affirmatively pleaded that defendants had theretofore "entered into *a settlement agreement* at the suggestion of and with the approval of [receiver] and his attorney whereby defendants did pay [the sum of $1,159.98] *in full and complete settlement of any amount due or to become due from defendants to* [*receiver*]." Defendants then further pleaded: (a) that *in reliance upon said agreement* they abandoned all efforts to collect from their subagents and that receiver *agreed to assume the losses sustained;* (b) that having heard nothing for more than one year from the time of the *settlement agreement,* defendants, in due course, destroyed all records pertaining to the matter instantly involved; (c) that it was now impossible to prepare a defense to the matters instantly involved due to the destruction of their records *in reliance upon the aforementioned settlement agreement,* and that it would be grossly inequitable to permit receiver to maintain this action more than two years *after settlement* of the matter; (d) that

receiver had forfeited any right to recover by *reaching a settlement* with defendants two years ago; and (e) that receiver's tardiness rendered him guilty of laches. In connection with the defenses thus made, defendants paid into the registry of the court the aforesaid sum of $1,159.98.

Trial to the court of the issues presented by the motion to show cause and defendants' answer resulted in a judgment for receiver: on count one of the motion in the sum of $4,311.04 with interest thereon from June 16, 1958, in the sum of $879.45; on count two in the sum of $3,404.14; total on both counts, $8,594.63, for which execution was ordered to issue at request of receiver. The decree further ordered and adjudged that if the execution be not satisfied within 30 days after issue, defendants would be guilty of contempt, for which citation would issue upon due application. (Receiver admits that the judgment rendered on count one should be credited with the sum of $1,159.98, paid into the court registry in accordance with the tender made by defendants.)

■ Defendants appealed. Jurisdiction of the appeal lies in this court because the plaintiff receiver herein is a state officer. Article V, § 3, Constitution of Missouri, V.A.M.S.; Leggett v. General Indemnity Exchange, 363 Mo. 273, 250 S.W.2d 710, 711.

At commencement of the trial, it was stipulated: (a) that defendants had caused Eagle policies to be issued for which defendants were charged on Eagle's books with unpaid premiums in the sum of $4,858.32, subject to a credit of $547.28, leaving a balance of unpaid premiums, as shown by Eagle's records, in the sum of $4,311.04; (b) that defendants, by letter mailed to receiver on June 25, 1958, in which they enclosed a purported "list" of the amount owed by them to Eagle on the date Eagle was adjudged insolvent, advised receiver that their total indebtedness to receiver was $1,159.98, for which amount they, in said letter, enclosed checks, dated June 25,

1958, which receiver retained but did not present for payment; and (c) that Eagle's records also correctly showed the amount of unearned commissions owed Eagle by defendants to be $3,328.66, as alleged to be due and payable to receiver under count two of the motion.

The contract under which defendants conducted business as agents of Eagle, in material part, reads:

"IT IS HEREBY AGREED between the Company (Eagle) and the Agent (defendants) as follows:

"(1) Agent has full power and authority to receive and accept proposals for insurance covering such classes of risks as the Company may, from time to time authorize to be insured; to collect, receive and receipt for premiums on insurance tendered by the Agent to and accepted by the Company and to retain out of premiums so collected, as full compensation on business so placed with the Company, the following commissions:

Automobile Bodily Injury      30%
Automobile Property Damage     30%

"(2)   In the event of termination of this agreement, the Agent having promptly accounted for and paid over premiums for which he may be liable, the Agent's records, use and control of expiriations (sic) shall remain the property of the Agent and be left in his undisputed possession; otherwise the records, use and control of expirations shall be vested in the Company.

"(3)   It is a condition of this Agreement that the Agent shall refund ratably to the Company, on business heretofore or hereafter written, commissions on cancelled liability and on reductions in premiums at the same rate at which such commissions were originally retained.

\*      \*      \*      \*      \*      \*

"(6)   Accounts of money due the Company on the business placed by the Agent with the Company are to be rendered monthly by the Company; the balance therein shown to be due to the Company shall be paid not later than 30 days after the end of the month for which the account is rendered."

There seems to be no question that notice of the receivership came to defendants by mail about May 1, 1958. It advised defendants that the Superintendent of Insurance had issued a cease and desist order against Eagle and that defendants' license to represent Eagle was simultaneously cancelled. Defendants were also advised about May 5, 1958, that the Circuit Court of Cole County had entered its order permanently enjoining Eagle from engaging in any further insurance activity. On or about May 13, 1958, defendants received a directive entitled "Guidance for Handling Collections of Agents' Balances of Eagle Reciprocal Exchange." That document, to the extent material, gave notice to Eagle agents that after May 1, 1958, agents: (a) "had [no] authority to transact any business, issue any policies, write any business, or perform any other act of any kind or nature for or on behalf of Eagle \* \* \*"; (b) "are hereby authorized and directed to accept all payments on premium notes for earned premiums up to May 5, 1958, but you are instructed and directed to immediately transmit the same to the Receiver. You have no authority to accept payment for unearned premiums"; (c) "will be held responsible for all monies collected for or on behalf of Eagle \* \* \*, and this is true even though such monies may be earned or unearned premiums"; (d) "are directed to immediately transmit to the Receiver, a statement of the amount or amounts of money collected by you for or on behalf of Eagle \* \* \* and the amount due by you to [Eagle]."

On June 16, 1958, Mr. Charles Howard, attorney for receiver, wrote defendants requesting an accounting for monies collected and owed by defendants to the company, in reply to which defendants, in the aforesaid letter of June 25, 1958, forwarded

an alleged accounting, accompanied by their checks for $1,159.98. That letter stated:

"In accordance with your letter of June 16, we are attaching hereto a list of our account with Eagle Reciprocal Exchange as of April 30, 1958, according to our records.

"Sheet #1 indicates the charges on various policies which we have collected. Sheet #2 are the credits due us by Eagle.

"Therefore, subtracting the credits from the charges leaves us owing Eagle, according to our records, a balance of $1159.98 and we are attaching our checks in this amount.

"To the best of our knowledge and belief, this is a true and accurate account."

On October 14, 1958, defendants were advised by Mr. Howard that an audit of Eagle's records showed defendants owed Eagle $4,311.04 instead of the $1,159.98, for which amount defendants had sent receiver their checks. In that letter, Mr. Howard also suggested that the parties meet in Jefferson City to discuss their differences. On or about November 20, 1958, defendants, in compliance with that request, conferred with Mr. Howard in Jefferson City, at which time defendants left with Mr. Howard the statement and checks theretofore sent to him. Defendants heard nothing further about any indebtedness owing to the Superintendent of Insurance on account of the Eagle matter until the filing of this proceeding.

Mr. Hutchings testified: The books and records from which defendants furnished Mr. Howard with the amount defendants claimed they owed on this account were no longer left "in one little pool." They were intermingled with other files. These books and records possibly could be made available after a lot of "rooting" but defendants knew of no reason to keep them segregated because they believed, after their conference with Mr. Howard, that the contention existing between defendants and the receiver was "water under the dam", it being defendants' opinion that their affairs with Eagle were fully resolved and that they were under no further responsibility in the matter. He further testified that when he and Mr. Bell met with Mr. Howard in Jefferson City there was no reference made to defendants' owing the receiver any sum for unearned commissions, payment of which was demanded in the second count of the motion to show cause; and that had defendants known that they would thereafter be confronted with a claim for unearned commissions, they would have kept their records intact.

On cross-examination, Mr. Hutchings testified: Defendants did business with their clients on an open account basis, the clients usually paying them on a 30 or 45 day basis. On some accounts, defendants would take a small down payment from the purchaser of a policy and carry the balance of the account themselves; they tried to get whatever they could at the time of issuance of a policy.

On further cross-examination, Mr. Hutchings testified that under defendants' agreement with Eagle, Eagle sent defendants a bill each month for the business produced during the preceding month. That bill was due 30 days after defendants received the statement; in other words, May's business would be due no later than July 31, which, he said, is standard insurance practice. He expressly admitted: "We were required to pay at the end of sixty days * * *. [W]e would get our accounting between the 25th of June and first of July. Then we were obligated to pay the 31st of July"; and further:

"Q (by Mr. Howard) This business that you carried, you were carrying at your own risk, weren't you—this credit business?

"A With the understanding that we could cancel them flat up to thirty days,

and on the second thirty days would be on us.

*   *   *   *   *   *

"Q  You say in the first thirty days there was a flat cancellation?

"A  That is right. You won't find it covered in the agency contract. That was an oral agreement.

*   *   *   *   *   *

"Q  Where you issued a policy to an insured and he hadn't paid you in a thirty-day period, you regarded yourself as being obligated to the company, whether your insured ever paid you or not?

"A  No, we never did regard ourselves as taking over our insureds' obligations to pay this bill. However, we was obligated to make the payment for him to the insurance company, and then cancel his policy and withdraw the money we had paid to the insurance company.

"Q  Then you say there was an extra custom which was not in your agency contract, covering the thirty-day period?

"A  That's correct."

Mr. Hutchings also testified that it was defendants' practice to refund ratably to Eagle unearned commissions on cancelled policies computed at the same rate at which the commissions were originally retained.

On further cross-examination, Mr. Hutchings also testified: At the conference with Mr. Howard in Jefferson City in November, 1958, Mr. Howard and defendants had argued about the amount defendants owed the receiver. It was defendants' contention that they had not collected the premiums to the extent claimed by the receiver on policies written by defendants for Eagle, but he admitted that defendants never produced any of their original books of account; and they had only furnished the receiver with a "summary" thereof. At that conference, Mr. Howard stated that he would take defendants' figures, check them out with the receiver's auditor and determine whose figures were right. Mr. Hutchings refused to say that Mr. Howard had not told defendants at that conference that the matter had to be held until a later date for determination. He did admit, however, that he at all times knew that the checks left with Mr. Howard had never been negotiated, saying: "Being frank with you, we had hoped you lost them, being honest about it. That is what we thought, you probably lost them and forgot about them."

On further cross-examination, Mr. Hutchings testified: Whenever defendants sent a bill to an insured, they sent the original along with the policy to the purchaser; a copy was placed in defendants' "account receivable" file; a copy was placed in defendants' "account payable" file; and a fourth copy was placed in defendants' "expiration" file. When Eagle went into receivership, the files with reference thereto were "all pulled out and put into one group, one folder, and from this the accounts receivable file, the accounts payable files and the expiration files were pulled out, and the whole * * * put together." He said he did not know where those files are today.

Defendant John E. Bell was present at the trial but was not called as a witness in behalf of defendants and did not testify.

Mr. Howard testified in rebuttal: The audit of Eagle's books of defendants' account (copies of which were admitted in evidence) showed defendants owed $4,311.04 on their account current. Defendants had paid into the court registry $1,159.98, leaving a balance on their current account in the sum of $3,151.06. At the November, 1958, conference defendants admitted that the figures shown them by the receiver were correct; they merely took the position that they did not owe $3,151.06 on their current unpaid premium account for the reason that that sum included premiums they had not collected. Mr. Howard further testified that he told defendants that the conference gave rise to two problems: (1) whether defend-

ants should be credited with premiums which they contended they had not collected, and (2) whether defendants should be given any credit for the "30-day cancellation rule which seems to prevail in the industry." At no time did he make any representations to either defendant that the checks for $1,159.98 would settle their account with the receiver. He simply advised them that he could not answer their contentions at that conference; that the receiver should be given some proof other than what defendants had "said" and the summary allegedly made from their records; and that until these questions were decided in this receivership or in some other receivership case, "we would just have to let the matter ride along until we could obtain an answer."

Defendants' first "point" is thus stated: "The trial court grossly abused its discretion in designating [defendants] trustees of a fund which never existed, by ignoring the true issue in this case and making a convenient finding of fact that [defendants] had collected the funds." In support of that contention defendants cite: Mueller v. Larison, Mo., 355 S.W.2d 5; Doak-Riddle-Hamilton Co. v. Raabe, 63 Ind.App. 250, 114 N.E. 415; Fitzburgh v. Everingham, (N.Y.1836) 6 Paige 29; Monitor Mutual Fire Insurance Co. v. Young, (1873) 111 Mass. 537; Trice v. Lancaster, Mo.App., 270 S.W.2d 519, 526; Clay, Superintendent, etc. v. Independence Mutual Ins. Co., Mo., 359 S.W.2d 679; Langdeau v. Bouknight, (1961) 162 Tex. 42, 344 S.W.2d 435; and Jefferson Fire Ins. Co. v. Bierce & Sage, (C.C.Mich., 1910) 183 F. 588. The judgment stated that "the defendants * * * were insurance agents doing business in the State of Missouri prior to May 1, 1958, and were duly licensed as such by the State of Missouri, and that they were agents of Eagle Reciprocal Exchange, and that they had entered into a written contract with Eagle Reciprocal Exchange, and as such agents they were trustees for and fiduciaries of Eagle Reciprocal Exchange and had col-

lected the monies claimed under Counts I and II, and that said monies were held in trust and fiduciary capacity for the use and benefit of Eagle Reciprocal Exchange, and that said monies and funds are the property of the Plaintiff-Receiver, and that said defendants have knowingly and intentionally retained said trust and fiduciary funds and monies, and have converted the same to their own use, contrary to and in violation of the Orders and Decrees of this Court of May 1 and 5, 1958; and the Court further finds that said defendants refused, and are now refusing, to deliver said monies and funds to the Plaintiff-Receiver herein, contrary to the Orders of this Court." With the exception of the cases of Clay, Superintendent, etc. v. Independence Mutual Ins. Co., which is a 1962 Missouri case, and Langdeau v. Bouknight, which is a 1961 Texas case, none of the cases above cited shed any light whatever upon the *issues as pleaded* in the instant case. The two cases above noted will be hereinafter discussed in connection with those issues.

■ The matters here in issue are in part, at least, equitable in nature. But, be the case one of law or equity, the cause was tried to the court and it is the duty of this court on appeal of a court-tried case to review it upon both the law and the evidence as a *suit of an equitable nature*. S.Ct. Rule 73.01, V.A.M.R. In so doing we review the record de novo, consider the credibility, weight and value of the evidence, determine the facts as we find them to be, deferring to the findings of the trial court to the extent proper, giving heed to his more favorable position to evaluate and judge the credibility of the witnesses, and render judgment in accordance with our conclusions thus reached. Euge v. Blase, Mo., 339 S.W.2d 807, 810; Cox v. Bryant, Mo., 347 S.W.2d 861, 863; Mueller v. Larison, Mo., 355 S.W.2d 5, 8.

As we read this record, no extended discussion of the evidence pertaining to the two basic elements upon which the ultimate disposition of this case must rest is

necessary. Defendants admit that when first advised that an accounting was sought by the receiver they had in their custody and readily available for production the books, records and accounts necessary to the making of such an accounting. It is also clear that at the conference held between defendants and counsel for receiver in November, 1958, defendants learned that Eagle's books showed defendants to have been indebted to Eagle when placed in receivership for unpaid premiums in the sum of $4,311.04. During that conference, defendants asserted that they owed a lesser sum, yet they did not then or thereafter submit their books of account or even present or produce the "one little pool" of records they had collected, upon which they assertedly had made the calculations resulting in the tendered checks amounting to $1,159.98. In this connection, however, it seems to be conceded that defendants were not advised at that conference that Mr. Howard would thereafter demand from defendants an accounting for and payment of unearned commissions retained by defendants on premiums which would never become earned because of the cancellation of all outstanding Eagle policies as of the date Eagle was placed in receivership. Indeed, there seems to be only two things of which we may be certain to have resulted from that conference: One is that Mr. Howard admittedly was uncertain as to whether defendants were liable to account for and pay over to the receiver premiums not theretofore remitted, irrespective of whether defendants had actually collected them, or unearned commissions retained by defendants; the other is that defendants knew, or as ordinarily prudent persons should have known, they would be required to account to the receiver or to the court for some amount at some time. Yet, despite the knowledge with which defendants obviously were charged, they, as Mr. Hutchings testified, deliberately so intermingled the records theretofore assembled with other files as to make it most difficult to effect an accurate accounting; and, although Mr. Hutchings admitted that their books and other records possibly could be made available after a lot of "rooting", they made no gesture of willingness to do so, for the reason, as Mr. Hutchings testified, they "believed" the matter was "water under the dam."

■ These unadorned facts force the conclusion that the contention that defendants and the receiver "entered into a settlement agreement" is without merit; and, it follows, as a matter of course, that all of the allegedly calamitous results that flowed from that alleged (and unsubstantiated) "settlement", as set forth in defendants' other pleaded contentions, are, perforce the false premise upon which they are predicated, without merit.

■ It has long been the public policy of this state that the insurance business so affects the public interest as to require its regulation by the state and to hold all who engage therein to strict account. State ex rel. Missouri State Life Ins. Co. v. Hall, 330 Mo. 1107, 52 S.W.2d 174, 177; Trice v. Lancaster, Mo.App., 270 S.W.2d 519, 525; State ex rel. Johnson, Adm'rx v. Leggett, Superintendent, etc., Mo., 359 S.W.2d 790, 793–794, and the cases therein cited. Section 375.290, subd. 1 declares that any person who, as agent of an insurance company, receives or collects money on any account whatsoever for any insurance company doing business in this state shall be responsible in a trust or fiduciary capacity for any money so collected or received by him for such company; and § 375.290, subd. 2 provides severe criminal penalties for willful violations of § 375.290, subd. 1. The rule in Missouri and throughout most, if not all, of the states of this union is and for many years has been generally stated as is well expressed in Appleman's "Insurance Law and Practice", Vol. 16, § 8785, p. 223: "The mere existence of a fiduciary relationship between an insurance company and its agents entitles it to an accounting on demand, and it is not necessary for such company to show that anything would be found due from the agent." It is also clear

that the statutory duty to account for monies *actually* collected or received (as declared in § 375.290) does not limit the civil liability of an insurance agent to account to the insurer, and especially to the receiver of an insolvent insurer, not only for monies that he has collected but also for monies that he, *under his contract of employment*, should have collected. 44 C.J.S. Insurance § 157, pp. 831–832. "In fact, even without such a special statutory provision as exists in Missouri, the law generally has recognized an insurance agent, charged with the duty of collecting premiums and not granted the right by his contract to use the funds personally, as having prima facie a fiduciary responsibility." Twin City Fire Ins. Co. v. Green, 8 Cir. (1949), 176 F.2d 532, 535 [2].

In the very recent case of Clay, Superintendent, Division of Insurance v. Independence Mutual Ins. Co., Mo., 359 S.W. 2d 679, the liability of an agent for both uncollected premiums and unearned commissions was thus stated, 359 S.W.2d loc. cit. 683: "The first issue raised on this appeal is whether the receiver is entitled to recover from the insurance agency *unearned premiums* shown by the monthly reports to be owing but not remitted to the insurance company, on the 56 cancelled policies. By contract Time was obligated to pay Independence the balance shown on monthly reports. Both by contract and by statute a trust or fiduciary relationship existed between Time and Independence as to all premiums received by Time on business of Independence. As a trustee it was Time's duty, without alternative or option, to pay the balances shown at the specified times." And, 359 S.W.2d loc. cit. 684: "The second question is whether the receiver is entitled to recover from Time *commissions* on premiums unearned because of the June 2 court order cancelling all Independence policies. By a plain and unambiguous provision of the agency agreement it was the obligation of Time to ratably refund commissions on cancelled policies. When the receiver was appointed

and all policies of Independence were cancelled by the Circuit Court of Cole County Time was duty bound under its contract to ratably refund to the receiver the commissions it had retained on all policies of Independence it had written but for which it had not previously accounted to Independence."

In Langdeau v. Bouknight, (1961) 162 Tex. 42, 344 S.W.2d 435, 440, the court, quoting with approval from an earlier Texas case, Wheeler v. Clark, Tex.Civ.App., 306 S.W.2d 158, said: "' * * * The truth is that when the Receiver was appointed and all policies cancelled by the Travis County District Court, an indebtedness then and there was created in favor of the policyholders and against the Receiver for the amount of unearned premiums and it was the duty of the Receiver to pay to such policyholders, on a pro rata basis, these unearned premiums, and at the same time Clark became indebted to the Receiver for the total sum of unearned commissions on the policies he had theretofore written.' " See also Daniels-Greager v. Caledonian Ins. Co., 103 Colo. 323, 86 P.2d 264; Atkins v. Williamson, C.C.A. Texas (1959), 320 S.W.2d 425; Holz, Superintendent, etc. v. M. L. Nathanson & Co., Inc., 5 Misc.2d 266, 159 N.Y.S.2d 785; Bohlinger, Superintendent, etc. v. Ward & Company, 20 N.J. 331, 120 A.2d 1.

■ Prolonged discussion of or further quotation from the above cases is unnecessary. They establish the principle that an agent chargeable with funds due an insolvent insurer may not be preferred to the detriment of policyholders or other creditors by reason of any custom or practice violative of the contract defining the agent's duties to collect and to account for funds due the insurer.

■ As hereinabove shown, defendants' contract with Eagle provided (a) that defendants refund ratably to Eagle, on business theretofore or thereafter written, commissions on cancelled liability at the same rate at which such commissions were orig-

inally retained; and (b) that Eagle would each month render an account of the business placed by defendants and that the balance shown to be due Eagle should be paid not later than 30 days after the end of the month for which the account is rendered. Defendants, without legal cause or excuse, refused to account to the receiver as required by lawful order of the trial court and there is nothing in the record tending to show that Eagle's records did not truly reflect the amounts of premiums for which defendants had not remitted to Eagle and the amount of unearned commissions which defendants had retained.

Subject to being credited with the sum of $1,159.98, paid into the court registry by defendants, the judgment of the trial court against defendants for those amounts, with interest thereon as awarded, should be and is affirmed. We are not convinced, however, that mere failure of satisfaction of the judgment on execution, in and of itself, should subject defendants to citation for contempt and the judgment to that extent should be and is reversed.

All concur.