Argued March 6, reversed May 24, 1967

IN THE MATTER OF THE RECEIVERSHIP OF
# SUPERIOR MUTUAL INSURANCE CO.

KORLANN, *Respondent, v.* E-Z PAY PLAN,
INC. ET AL, *Appellants.*

428 P. 2d 172

*Norma J. Paulus* and *Edward L. Clark, Jr.,* Salem, argued the cause for appellants. With them on the briefs were Clark & Marsh, Salem.

*Paul D. Hanlon,* Special Assistant Attorney General, Portland, argued the cause for respondent. With him on the brief were Hart, Veazie, Bischoff & Hanlon, Portland.

Before PERRY, Chief Justice, and McALLISTER, SLOAN, O'CONNELL, GOODWIN, DENECKE and LUSK, Justices.

GOODWIN, J.

Plaintiff is the Oregon receiver for Superior Mutual Insurance Co., an insolvent Wisconsin corporation. Defendants are two Oregon corporations, Manhattan Agencies, Inc., which placed automobile liability insurance with Superior and other insurance companies, and E-Z Pay Plan, Inc., which discounted the time-payment contracts of Manhattan's customers as a means of financing their insurance premiums. Manhattan and E-Z Pay appeal a decree in favor of Superior's receiver.

At the time of Superior's insolvency, the account between Manhattan and Superior showed credits favoring Superior in the sum of $39,194.29 (earned premiums and other credits), and credits favoring Manhattan in the sum of $112,907.22.

Manhattan's favorable balance included $30,663.63 in unearned premiums due Manhattan from Superior for distribution to Manhattan's customers as the result of cancellations effected in the regular course of business prior to Superior's insolvency. The remainder of the balance shown to be in Manhattan's favor was made up of unearned premiums that became "unearned" upon Superior's insolvency. *Holz v. Smullan,* 277 F2d 58, 62 (7th Cir 1960).

(In outlining the facts we have used figures quoted by the parties solely for the purposes of illustrating their legal theories, and we do not adopt any of these figures or treat them as established for accounting purposes.)

Manhattan, when notified of Superior's insolvency, was holding cash premiums which had been advanced by E-Z Pay in the sum of $46,991.36. This sum was returned to E-Z Pay by Manhattan and is the principal subject matter of this litigation.

The money advanced by E-Z Pay was in each instance secured by the assignment to E-Z Pay of the customer's insurance policy. E-Z Pay was, therefore, ultimately entitled to any unearned premium that might be refunded by Superior in the event of the cancellation of any policy so assigned to E-Z Pay.

At all material times prior to Superior's insolvency, Superior and Manhattan had been settling accounts with each other under an arrangement known in the insurance industry as an "account current, seventy days."

An account current is defined as "the insurance agent's statement of policies written and premiums returned on cancellation during the month, net premiums being recorded whether paid or not." 16 Appleman, Insurance Law and Practice § 8786, at 229 (1944). Such accounts are not unusual in the type of business being conducted in this case. See *Bushnell, Receiver v. Krafft et al,* 133 Ind App 474, 183 NE2d 340 (1962).

An "account current, seventy days," according to the testimony, is the same as a thirty-day "account current" except that the agent has seventy days after a policy is issued in which to remit net balances, if any, that may be due the insurer.

The receiver does not deny that if insolvency had not intervened, Manhattan would have been entitled to continue to settle its account periodically by remitting only the net balances credited to Superior on any given settlement date. The record shows, for example, that ten days before the insolvency occurred, Manhattan had forwarded to Superior all sums due Superior under the accounting system employed.

Under the method of doing business followed by Manhattan and Superior, Manhattan received from Superior (or deducted from premiums due Superior) and credited to its customers' accounts unearned premiums resulting from cancellations. (As is apparently the custom in the trade, these unearned premiums were rarely returned in cash to the customer, but were ordinarily used in the customer's behalf either to satisfy his debt to E-Z Pay or to obtain new insurance to replace the insurance which had been canceled. See, for a case involving similar practices, *Downey v. Humphreys,* 102 Cal App 2d 323, 227 P2d 484 (1951).)

The testimony in the case at bar indicated that most, if not all, cancellations in the course of business were actually made by Manhattan, usually because of the nonpayment of a premium installment when due. Superior apparently allowed Manhattan unlimited discretion in making such cancellations. These cancellations were the only practical method available to Manhattan to encourage payment of installments. In case of such a cancellation, Manhattan would credit Superior with the amount of the refund and then pay over to E-Z Pay the unearned premium. No money would move from Superior to Manhattan, but the "account current" would show that the refund had reduced the amount due Superior from Manhattan.

On the theory that Manhattan was a trustee and thus bound to pay unconditionally all premium money, earned or unearned, received from policy holders to Superior's receiver upon notice of Superior's insolvency, the receiver obtained an order to show cause against both Manhattan and E-Z Pay. The order apparently was drawn according to the receiver's theory that Manhattan's payment to E-Z Pay after notice of insolvency was a conversion and that the receiver could therefore follow the money into E-Z Pay's hands by treating E-Z Pay either as a converter or as a constructive trustee.

The record shows that E-Z Pay and Manhattan had certain officers and shareholders in common. The two defendants concede that they worked closely together, Manhattan producing the insurance business and E-Z Pay financing the premiums. The business attempted to satisfy the insurance needs of young or "rated" drivers, virtually all of whom had difficulty buying insurance. In such a business, the premiums and the risks were high. Most of the premiums had to be financed and paid in monthly installments.

In considering the rights of the parties in this case, we deem it irrelevant that Manhattan and E-Z Pay shared common ownership and were more or less under common management. There has been no pleading or proof of any impropriety in their method of doing business. Accordingly, the two corporations, for the purposes of this case, are treated as if they were strangers acting in the ordinary course of business.

Manhattan defended the show-cause order by asserting a right of setoff. Manhattan argued that as Superior's creditor it could set off against any claims of Superior all sums due Manhattan on behalf of its customers according to the method of accounting employed

between Manhattan and Superior at all times prior to insolvency. Prior to insolvency, there is no doubt that Superior had treated all unearned premiums as money "due" Manhattan. In the periodic settlement of their mutual account, Superior had always allowed Manhattan to set off all unearned premiums against premiums to be accounted for by Manhattan in striking the net balance between them.

Upon the insolvency of Superior, the consideration for the premiums theretofore paid by Manhattan's policy holders failed and the policy holders or their assignee became entitled to the return of the unearned portions of the premiums. Notwithstanding the fact that E-Z Pay, as an assignee, was the ultimate "owner" of most of the unearned premiums, Manhattan, as a broker, remained Superior's creditor for the purpose of settling accounts with Superior and making eventual disbursement to policy holders.

The trial court, however, disregarded the established business practices of Manhattan and Superior, and relied upon cases decided on dissimilar facts to hold that Manhattan was, in effect, a trustee for both the earned and the unearned premiums. The result was to make Manhattan a converter of the $46,991.36 returned to E-Z Pay. This was error. Manhattan was a creditor, and was entitled to a setoff.

■ Setoff is usually allowed where, through a course of separate transactions, two parties become indebted to each other. If one of the parties becomes insolvent, the other, instead of paying his debt in full and receiving a dividend on what is owed him, is held only for the difference, if any, between his debt and the insolvent's. The reason for such a rule is said to lie in the injustice of a contrary rule. *Carr v. Hamilton,* 129 US 252, 255, 9 S Ct 295, 32 L Ed 669 (1889).

██ Between solvent merchants, setoffs are a matter of routine bookkeeping. *Emerick Co. v. Bohnenkamp & Assoc.,* 242 Or 253, 409 P2d 332 (1965). When insolvency occurs, the party exercising the setoff, in most cases, obtains a preference as compared to creditors who do not have a setoff. Courts of equity do not regard such a preference as discriminatory or unfair to other general creditors. In essence, general creditors are entitled to look only to the favorable balance, if any, as an asset of the insolvent's estate. The preferential effect of setoff, like that of other forms of security, is well recognized but has not prevented setoff being favored in bankruptcy. See *Emerick Co. v. Bohnenkamp & Assoc.,* supra, and 4 Collier, Bankruptcy 708, § 68.02, notes 18 & 19 (14th ed 1964).

█ Ordinarily, in the absence of a statute or an agreement to the contrary, when an insurance company issues policies to policy holders in reliance exclusively upon the credit of the agent who produced the business and looks solely to that agent for payment, as the record shows was the practice in the case at bar, the company and the producing agent are creditor and debtor. *Wallace v. American Life Ins. Co.,* 116 Or 195, 237 P 974 (1925).

██ In a debtor-creditor relationship, setoff upon the insolvency of either is a recognized and accepted practice. See *Downey v. Humphreys,* supra. On the other hand, where the relationship is that of principal and agent, with premiums to be remitted only when and if collected, the producing agent is treated as a trustee of the premiums and has no right to deviate from the terms of the agency agreement by setting off any of his claims against the trust fund. *Bohlinger v. Ward & Co.,* 20 NJ 331, 120 A2d 1 (1956). To like effect, see *Bohlinger v. Mayville Realty Company,* 135 NYS2d

865 (1954), affirmed without opinion, 285 App Div 1045, 141 NYS2d 509 (1955).

■ As noted, there was no written agreement between Superior and Manhattan upon which their relationship can be documented. No Oregon statute characterizes a relationship such as existed between Superior and Manhattan as a matter of law. Accordingly, the legal effect of the relationships between Superior and Manhattan and between Manhattan and its customers must be established from their manner of doing business. The method of doing business was clearly a mutual debtor-creditor relationship at all times prior to insolvency.

The phenomenon of insolvency did not, of itself, work a change in Manhattan's relationship to Superior, nor in Manhattan's relationship to its customers. We need not decide in this case the extent of Manhattan's liability to its policy holders, as that matter is not before us. But insofar as Manhattan's accounts with Superior are concerned, it is clear that Manhattan had a right at all times prior to Superior's insolvency to exercise a setoff.

■ It is a well-established principle that a liquidator or receiver occupies no better position than his insolvent occupied at the time of insolvency. *Bohlinger v. Zanger*, 306 NY 228, 117 NE2d 338 (1954). He takes the property and rights of the one for whom he acts, subject to the same equities and defenses in others that existed before insolvency. *Downey v. Humphreys,* supra.

We hold that Manhattan was entitled to set off the moneys due from Superior against premiums in Manhattan's hands. The net result leaves Manhattan with a claim as a general creditor against Superior.

Reversed.

O'CONNELL, J., dissenting.

The source of the error in the majority opinion is the assumption that because the parties employed a particular bookkeeping device for convenience in adjusting their mutual accounts they necessarily stand in a debtor-creditor relationship. The solution of the problem in this case should not turn upon the superficial fact that the parties set up a particular accounting system to adjust their accounts; the important inquiry is whether there is a sound reason for permitting a set-off under the circumstances of this case.

Assuming, as the majority does, that the right of set-off automatically follows once the parties are in the relation of debtor and creditor, I question the court's conclusion that a debtor-creditor relation was created in this case. It is true that Manhattan was obligated to pay the full amount of the premium even though that amount had not yet been received from the insured. But the question is whether this is to be looked upon as an obligation of Manhattan to finance the sale of insurance by Superior or simply as a convenient method of funneling the installment premiums from the policyholders through Manhattan to Superior and funneling the unearned premiums from Superior through Manhattan to the policyholders.

It is to be borne in mind that Superior, not Manhattan, was the insurer who undertook the risk of loss in case of an accident and it was Superior and not Manhattan who was entitled to receive the premium for undertaking this risk. After the exchange of consideration between Superior and the insured (through the offices of Manhattan), Manhattan had no financial interest in the transaction. If there was a loss, it fell upon Superior; if there was a cancellation, the unearned premium went to the policyholder. (It is im-

material that the return of the premium was effected through the agency of Manhattan). Receiving no benefit from the transaction other than its commission, it does not seem reasonable to regard Manhattan's payment of the full amount of the premium as an extension of its credit and an imposition of liability as a debtor in the sale of insurance.

The majority states that the policies were issued "in reliance exclusively upon the credit of the agent." The evidence merely shows that Superior looked only to Manhattan for payment of the premiums. But as long as Manhattan was transmitting the premiums to Superior, there was no necessity to look to the policyholders for payment. This does not say that Superior would be precluded from the recovery of an unpaid earned premium from a policyholder if Manhattan were removed as agent.

If Manhattan and Superior were in a debtor-creditor relationship, how would the majority characterize Manhattan's interest (prior to insolvency) in the unearned premiums held by Superior? Certainly Manhattan had no beneficial interest in such premiums—they belonged to the policyholders. Yet these premiums are used in the bookkeeping arrangement as a credit against Manhattan's obligation to account to Superior.

The bookkeeping system adopted is best explained as a method of adjusting the interest of policyhloders in the unearned premiums and the interest of the insurer in the premiums received from policyholders and held by the agent.

The cases treat as axiomatic the principle that premiums paid to an insurance agent constitute a payment to the insurer, and that the agent holds such premiums as a fiduciary for his principal, the in-

surer.[1] The majority apparently concedes this to be the general rule but argues that Superior and Manhattan created a debtor-creditor relationship in substitute for the usual principal-agency relationship. As I have already noted, this intent to modify the normal relationship is derived by the majority from the fact that the parties adopted an arrangement known in the insurance business as an "account current, seventy days." But the courts have not deemed this kind of accounting procedure sufficient to change the basic relationship of principal and agent.

*Bohlinger v. Ward & Company,* 20 NJ 331, 120 A2d 1, 3 (1956) will serve as an example. In that case the agent was obligated to account monthly for collected premiums and, as in the instant case, "extended credit to some of its customers and on occasion paid premiums to the company before collecting them from the policyholders." In an opinion written by Justice William J. Brennan, Jr., the court held that the insurer's agent was not entitled to a set-off upon the liquidation of the insurer. In answer to the agent's argument that the bookkeeping devices adopted by the parties converted the relationship into that of debtor and creditor, the court said:

> "We fail to see how these departures from the letter of the procedure for settling accounts and handling premiums contemplated by the agreement operated to destroy the basic relation of principal and agent established by the agreement. The more

---

[1] See cases cited in Bohlinger v. Zanger, 306 NY 228, 117 NE2d 338, 341-342 (1954).

The agent's fiduciary responsibility to hold collected premiums for the insurer exists apart from statute. Twin City Fire Insurance Co. v. Green, 176 F2d 532, 535 (8th Cir 1949). On rehearing, 177 F2d 626 (1949), the court reversed the prior finding of a debtor-creditor relationship on grounds of insufficient evidence that the fiduciary relationship had been transformed.

logical inference is that, at best, the departures evidence a greater solicitude 'For the convenience of the Agent,' although doubtless better serving the convenience of the company as well. Moreover, we deem it significant that the defendant has not taken issue in this court with the observation of the Appellate Division that [34 N.J.Super. 583, 43 A.2d 41] 'The reported cases disclose that a like course of accounting procedure is not uncommon in the insurance business.' Certainly in the entire setting, taking into account the agency agreement and the seeming consistency of the practices with the customs and usages of the insurance industry the situation is not at all comparable to that in State v. Western Union Telegraph Company, 17 N.J. 149, 110 A.2d 115, 117 (1954), upon which defendant chiefly relies, for this is not a case, paraphrasing the test of that decision 'when the court is able to say that the parties intended [the agent] to have the unrestricted use of the [premium] in the carrying on of its ordinary business and to be liable only to pay a similar amount to the [company].'" 120 A2d at p. 3.

In *Garrison v. Edward Brown & Sons,* 25 Cal2d 473, 154 P2d 377 (1944), the agent was obligated to render monthly accounts covering all policies written, renewed or cancelled and to remit the amount thereof the fourth day of the fourth month following that in which the business was written. The agent was responsible for the payment of all original and advance premiums on policies written by it. It was held that the accounting procedure adopted by the parties did not give rise to a debtor-creditor relationship.[2]

---

[2] The agreement expressly provided that all premiums collected by the agent were to be held by the agent "as a fiduciary trust until delivered to the company." (154 P2d at 379). The existence of this express agreement by the agent to hold premiums does not serve to distinguish Garrison from the case at bar because it has been held repeatedly that the agent's duty to account arises in the absence of an agreement to the contrary.

Commenting on a similar accounting practice and the "custom generally among insurance companies to permit the agent to deposit such collections in the agent's individual bank account and remit for same therefrom," (176 F2d at 535) the court in *Twin City Fire Ins. Co. v. Green,* 176 F2d 532, 534-535 (8th Cir 1949), said:

> "These conventional agency-contract provisions are not inharmonious with the statute, and without other indicative elements being involved in the situation they amount in legal-significance simply to an allowance of time in which to make premium collections and to an implied guaranty on the part of the agent for such premiums as he neglects or fails to collect 'on or before ninety (90) days' from the issuance of the policy. This collateral obligation of the agent to pay for any premiums which he has made the subject of a longer credit-extension or as to which he has for other reason failed in performing his duty to collect would not as a matter of law affect his accountability status under the statute for such premiums as he had in fact collected."

The court's reference to the agent's "accountability status under the statute for such premiums" was not intended to confine the principle to cases where a statute provides for accountability, for, as the court went on to say,

> "* * * even without such a special statutory provision as exists in Missouri, the law generally has recognized an insurance agent, charged with the duty of collecting premiums and not granted the right by his contract to use the funds personally, as having prima facie a fiduciary responsibility. See 16 Appleman, Insurance Law and Practice, § 8786, pages 224, 225; In re Mason Co., D.C. Conn., 254 F. 164." 176 F2d at 535.

*Bohlinger v. Zanger,* 306 NY 228, 117 NE2d 338 (1954) supports the view taken by the majority in the present case. But Judge Fuld's dissenting opinion in *Bohlinger* clearly discloses the error of the court's position. The court reasoned that since it was the common practice in the insurance business for the insurer during solvency to credit the agent for unearned premiums which the broker had remitted to policyholders upon the cancellation of policies, the right of set-off existed after liquidation of the insurer. Judge Fuld disclosed the error of this reasoning in the following paragraph:

"It may well be that, when a policy is terminated before settlement of the broker's accounts with the insurer, it is 'accepted practice' or 'general usage,' *in the absence of insolvency or an order of liquidation,* 'for brokers to deal with such accounts by remitting to the company the prorata premiums earned to date of termination * * * and by refunding to the insured the unearned portion' (opinion, 306 N.Y. at pages 232-233, 117 N.E. 2d 340). But it does not follow from this that a broker may adhere to his practice once insolvency intervenes or an order of liquidation is entered. When the insurer is fully solvent, and presumably able to pay all claims, nothing turns on the broker's act, or on the capacity in which he acts, in refunding the unearned premium to the insured. Had the broker not made the refund, the insurer would, of course, have done so; the repayment was handled in the most convenient manner and involved no more than a bookkeeping matter. With the advent of insolvency, however, the rights of creditors must be taken into account, and, for the first time, it becomes important to decide whether the premiums held by the broker belong to the insurer or to the insured. However current or accepted it may be, therefore, the practice of brokers in dealing with the funds of a solvent in-

surer can throw no light whatsoever on the question presented by this appeal, for it is in no way inconsistent with the rule that payment to the broker is payment to the insurer." 117 NE2d at 344-345.

Other cases also support the view that the adoption by the parties of an accounting system which permits the agent to postpone payment and which has the effect of permitting the agent to use collected funds during an interval does not convert an agency into a debtor-creditor relationship.[9]

As was observed in a note in 21 Brooklyn L Rev 282, 284 (1955), commenting on another but related aspect of accounting between the insurer and its agent, "this practice is merely a bookkeeping convenience, and as such should be subordinate to the rules of law governing the relation of the parties."

The majority opinion relies upon *Wallace v. American Life Ins. Co.*, 116 Or 195, 237 P 974 (1925) to support its view that Manhattan and Superior were in a debtor and creditor relationship. The case is inapposite. The court held that premiums collected by

---

[9] Harrison v. Birrell, 58 Or 410, 115 P 141 (1911); Maloney v. Rhode Island Insurance Co., 115 Cal App2d 238, 251 P2d 1027 (1953); Monitor Isurance Co. v. Young, 111 Mass 537 (1873); Clay v. Eagle Reciprocal Exchange, 368 SW2d 344 (Mo 1963); Clay v. Independence Mutual Insurance Co., 359 SW2d 679 (Mo 1962); Bohlinger v. Mayville Realty Co., 135 NYS2d 865 (1954), affirmed 141 NYS2d 509 (1955).

From an early date the English courts have held that in the absence of a del credere commission a broker could not retain any portion of collected premiums other than earned commissions against an insolvent underwriter. Minett v. Forrester, 128 Eng Rep 441 (C.P. 1811); Parker v. Smith, 104 Eng Rep 1133 (K.B. 1812); Goldschmidt v. Lyon, 128 Eng Rep 438 (C.P. 1812); Houstoun v. Robertson, 128 Eng Rep 1109 (C.P. 1816). In Wilson v. Creighton, 99 Eng Rep 576 (K.B. 1782) and Grove v. Dubois, 99 Eng Rep 1002 (K.B. 1789) the right of set-off was recognized but in those cases there was a del credere commission.

the insurance agent "belonged to and was the property of the defendant" insurance company. The amount due from the agent to the insurer was referred to as an "indebtedness" but the term was not used to describe a debtor-creditor relationship in the usual sense. The question before the court was whether the agent had breached a covenant not to enter into the employ of another insurance company while indebted to the insurer. The court held that "Inasmuch as this claim could have been discharged by the payment of a certain sum of money, it constituted a debt in favor of the defendant and against the plaintiff," (116 Or at 201) within the meaning of the covenant.

The error in the majority opinion can be described in yet another way. The majority first finds a debtor-creditor relationship between the insurer and its agent and then mechanically pronounces that set-off is applicable as if the latter follows the former as a matter of course. But set-off is a doctrine which has its source in equity and it will not be applied as between a debtor and creditor if it is not equitable to do so.

It is not equitable to permit set-off in the present case. If it is held that the unearned premiums in the agent's hands are not the property of the insurer, it would follow that the policyholders who had made payment of these premiums would be entitled to recover from the agent the full amount paid by them. But policyholders whose unearned premium had been remitted to the insurer would be required to share with other creditors of the insolvent insurer. Thus, simply because the payment of premiums by the insured to the insurer is made through a third person, the insurance agent, some policyholders are favored over others, a favoritism which arises from the purely fortuitous

circumstance that the premiums paid by the insured had not yet been remitted to the insurer. To avoid this preference in favor of one group of policyholders over another, the better reasoned cases hold that the insurer is entitled to recover the unearned premiums in the agent's possession at the time of the insurer's insolvency. The point is clearly made in *Garrison v. Edward Brown & Sons,* 25 Cal2d 473, 154 P2d 377, 382 (1944) where the court, in an opinion by Justice Traynor, said:

> "* * * This court could not recognize a claim for full satisfaction by the agent to whom the premium was paid without creating a preferential right for those insureds who happened to pay their premiums to an agent at the expense of all other creditors, including the other insureds."

The statement of Justice William J. Brennan, Jr. in *Bohlinger v. Ward & Co.,* 20 NJ 331, 120 A2d 1, 4 (1956) is particularly appropriate to the present case:

> "* * * The insurance company now being insolvent, allowance of the claimed credit would in actuality sanction a preference at the expense of other policyholders and creditors—and indeed what defendant did was done for the precise purpose of making its customers whole. It neither appears nor is it argued that defendant's conduct was infected with the taint of moral fraud, but plainly what was attempted here cannot be brought within the authority of a practice developed to facilitate the settling of accounts in the routine of the operation of a going business. See American Casualty Insurance & Security Co. v. Arrott, 180 Pa. 1, 36 A. 319 (Sup.Ct. 1897). The claims of the 150 to 160 policyholders for unearned premiums must stand with like claims of other policy holders similarly situated."

Other cases express the same view.[4] Comments in the legal periodicals uniformly criticize the cases holding that the agent has the right to set-off, for the reason that set-off has the effect of allowing a preference to certain policyholders.[5]

Since the majority opinion holds that the agent, Manhattan, can treat the collected but unremitted premiums as its own for purpose of set-off, what are the rights of the policyholders who paid in such premiums? The court's reasoning would seem to put the policy-

---

[4] "* * * Clark [the agent] could not thereafter make himself a preferred creditor by securing an assignment of the unearned premiums from the policyholders, and pleading these sums as an offset against his own indebtedness to the Receiver." Wheeler v. Clark, 306 SW2d 158, 159-160 (Tex Civ App 1957).

Fuld, J., dissenting in Bohlinger v. Zanger, 306 NY 228, 117 NE2d 338, 345 (1953), makes the point as follows:

"Today's decision may, on superficial consideration, appear to protect an innocent insured. However, it is pertinent to inquire at whose expense this protection is being afforded. All policyholders who have paid the insurer directly, or whose brokers have transmitted the collected premiums expeditiously, will have to await the orderly liquidation of the insurer's affairs, and will receive repayment of only so much of their unearned premium as the company's assets permit. Not so, though, the customers of the broker who delays his remittals; that broker, under the present decision, may conduct a private liquidation and immediately return to his customers the full amount of the unearned premium. Most strangely, therefore, the broker who remits promptly does a disservice to those who employed him to place their insurance."

[5] In a Note: Rights of Insurer's Liquidator to Unearned Premiums Collected by Broker in his Dual Agency Status, 54 Colum L Rev 638 at 640, the author points out the relative inequities of either result and then concludes, "equality of treatment in receiving refunds can be achieved only if the company's right to the funds is recognized * * *. Since the * * * rule [which requires the broker to pay over total premiums to the liquidator] guarantees policyholders with tardy or defaulting brokers equal rights and privileges with other policyholders, fairness requires that this rule be applied lest the former avoid sharing as well the losses which other policyholders must bear in the event of insolvency." See also, Notes in 18 Albany L Rev 266 (1954); 39 Minn L Rev 787 (1955); 21 Brooklyn L Rev 282 (1955).

holders in the position of creditors of the agent in these circumstances. What then would the result be if the agent rather than the insurer were insolvent? This is the same question posed by Fuld, J. in his dissent in *Bohlinger v. Zanger, supra* 117 NE2d at 345. There he said:

"* * * Under the logic and rationale of the present decision, if the insurance broker were to become bankrupt, or if he were to convert the premiums in his hands, the insurer could cancel the policy and throw the loss upon the insured so far as the unearned premium is concerned. That is the other side of the coin, the other 'way'—so to speak—that we must travel, if, as Judge DYE puts it (opinion, 306 N.Y. at page 233, 117 N.E.2d 340), the court is construing the statute as 'a two-way proposition'."

It is obvious that the majority of the court has not thought through the problem presented by this case, as a consequence of which an unjustified preference is created and, more important, we have in our reports a case which by its lack of analysis of the problem leaves in confusion the relationships which exist between the insurer, the insured and the general insurance agent.

The decree of the trial court should be affirmed.

DENECKE, J., joins in this dissent.