## EMPIRE FIRE & MARINE INSURANCE COMPANY,
*Appellant,*

*v.*

## FREMONT INDEMNITY COMPANY,
*Respondent.*

(A8410-05860; CA A39879)

750 P2d 1178

Linda M. Seluzicki, Portland, argued the cause for appellant. With her on the briefs were Michael E. Haglund and Lindsay, Hart, Neil & Weigler, Portland.

James D. Case, Portland, argued the cause for respondent. On the brief were William N. Mehlhaf and Case, Dusterhoff & Mehlhaf, Portland.

Before Buttler, Presiding Judge, and Rossman and Deits, Judges.

BUTTLER, P. J.

## BUTTLER, P. J.

Plaintiff, Empire Fire, brought this action against JKS, Inc., and Fremont Indemnity Company to recover insurance premiums that it claims JKS wrongfully paid to Fremont (defendant). Plaintiff appeals from a judgment for defendant on its motion for summary judgment.[1]

We summarize the record on summary judgment in the light most favorable to plaintiff. *Seeborg v. General Motors Corporation,* 284 Or 695, 700, 588 P2d 1100 (1978). JKS was a general insurance agent licensed in Oregon and Washington. It had brokerage agreements with several insurance underwriters, including plaintiff and defendant. The agreements are similar in that they authorize JKS to receive and accept proposals for insurance, issue policies and binders for insurance and collect premiums. JKS's subagents dealt with insureds directly and placed coverage through JKS. JKS forwarded documentation of all policies written or applied for to the underwriters, and the underwriters then billed JKS for the premiums owed on the transaction. JKS was to collect premiums on all insurance policies that it had placed with defendant and to remit payment to defendant within 45 days of the date when defendant assumed liability on each policy. As is common in the industry, JKS deducted its own commissions before sending the premiums to the underwriters. JKS's agreement with defendant required that JKS pay the full amount of the premium balance, whether or not JKS actually collected the premium.

JKS maintained an "operating" account, from which it paid operating expenses, and a "trust" account, in which it deposited all premium payments received. Premiums owed to different underwriters were not segregated in the trust account. JKS transferred its commissions from the trust account to its operating account. At some point, JKS began transferring more from the trust account than it was entitled to in commissions, in order to cover its operating expenses.

Defendant became aware of JKS's financial difficulties in late 1981 and allowed JKS to be late in forwarding premiums until June, 1982, when it cancelled its brokerage contract and prohibited JKS from writing new policies or

---

[1] The judgment complies with ORCP 67B.

renewals.[2] Defendant undertook to determine the exact amount of premiums owed by JKS and applied pressure on JKS to pay the amount owed by threatening to report it to the insurance commissioner.[3] Defendant was paid all but approx-

---

[2] McIntyre, former president of defendant, testified on deposition that defendant decided to cancel its agency agreement with JKS because of that company's high loss ratio and because an examination of its financial records revealed that it was insolvent. He determined in June, 1982, that JKS had withdrawn money out of its trust account for payment of its operating expenses in excess of its commissions; although he had not seen the bank records, it appeared to him that the company was $900,000 short in its trust account as of December 31, 1981. His testimony indicates, however, that he did not actually know the condition of the trust account, or even whether JKS had one.

"Their financial statements indicated that there was a substantial shortage in the trust account or in the accounting system. I don't even know whether they had a trust account, but they showed a great deal more in premiums payable to companies than they showed in accounts receivable, and in the spread as of December 31, 1981, was about $900,000.

"* * * * *

"* * * [T]heir financial statement clearly showed that there was a shortage between what they showed in the amount of money that they had—that they owed to insurance companies and what they had in receivables in cash to pay insurance companies.

"MR. CASE: Let me interrupt for a second. Those numbers do not necessarily relate to a trust account or a general account.

"THE WITNESS: I don't know what they—

"MR. CASE: I just wanted that clear on the record because it didn't seem like it had been cleared up.

"MS. SELUZICKI: Okay.

"THE WITNESS: I don't know what sort of banking arrangement that they had. I am just going on what the normal practice is, is that agencies will or brokers will have an operating account and a trust account.

"BY MS. SELUZICKI:

"Q: Do you know what kind of bank accounts Jones had?

"A: I had no idea what kind of bank accounts they had or where they were.

"Q: Do you know if they had a trust account at all?

"A: No, I have no idea.

"Q: So your determination was based on their financial statement?

"A: That's correct."

[3] Plaintiff's brief states that the evidence shows that "[defendant] began to pressure JKS to pay it premium dollars on insurance written for other insurers, particularly [plaintiff] * * *." The deposition testimony of Kaplan, plaintiff's vice-president, cited in support of that statement, does not support the suggested inference that defendant pressured JKS to pay it *from money collected for other insurers:*

"[Defendant] came to [Jones, president of JKS] in June of 1982 and told him that he had to pay up, and that it was his understanding if he didn't pay up that they would go to the insurance department of Oregon and he stood to lose his license and be out of business and that he took the money that he should have paid

imately $217,000 of the outstanding premium balance owed by JKS.

At no time did JKS disburse any funds to defendant that were not in fact due. Defendant knew that JKS wrote some insurance business for plaintiff but did not know the extent of the business or whether JKS was current in its payments to plaintiff. Defendant did not know the balance in the JKS trust account. At no time did JKS indicate that it did not have sufficient funds to pay defendant, that it was operating at a loss or that it had to pay defendant with money owed to another company. It can be inferred, however, that defendant was aware, after learning of JKS's financial difficulties, that JKS did not have sufficient funds to pay all of the underwriters to whom it owed premiums.

In the spring of 1982, plaintiff became aware of JKS's financial difficulties. By fall, 1982, JKS was approximately $500,000 in arrears in payment of premiums owed to plaintiff. In December, 1982, plaintiff agreed to loan JKS $450,000 by deferring collection of the premiums. A promissory note was secured by a stock pledge and a security interest in JKS's furniture, fixtures, equipment, chattel paper, assignable contract rights and general intangibles. JKS's financial condition continued to decline, and in February, 1983, plaintiff deferred collection of an additional $350,000 in premiums by taking a second promissory note, secured in the same manner as the first note.

In April, 1983, JKS defaulted on the notes to plaintiff. Instead of foreclosing, plaintiff obtained the right to approve, or disapprove all disbursements from the trust account and the right to have its agent co-sign all checks written on that account. Between April 25 and April 27, 1983, plaintiff authorized payment to itself of $472,479.44. It

---

to us and paid it to [defendant].

"* * * * *

"He told me that [defendant] had been in his office and had been leaning hard on him, had been making threats against him, and that he had found it necessary to take the funds which he would have paid us to pay [defendant] in order to keep himself from being put out of business."

None of the money in the trust account was earmarked.

brought this action to recover from defendant additional premiums that it claims JKS owes it, alleging claims of quasi-contract and interference with business and contractual relations. The court granted summary judgment to defendant on all claims, and plaintiff assigns error to that ruling.[4]

■    Plaintiff contends that the legal theory of quasi-contract provides the appropriate remedy for the recovery of premiums that defendant allegedly induced JKS to pay to defendant in violation of JKS's alleged fiduciary duty to plaintiff. The doctrine of quasi-contract is a remedial device afforded by law to accomplish substantial justice by preventing unjust enrichment. *Derenco v. Benj. Franklin Sav. Loan Ass'n,* 281 Or 533, 577 P2d 477, *cert den* 439 US 1051 (1978). Plaintiff contends, relying on *Korlnn v. E-Z Pay Plan,* 247 Or 170, 177, 428 P2d 172 (1967), that JKS was its fiduciary and held in trust all premiums received on policies written for it. It claims that defendant's receipt and retention of funds allegedly held in trust for plaintiff was a wrongful interference with the trust relationship and unjustly enriched defendant at plaintiff's expense and that defendant, therefore, has an obligation to return the funds.

■    Plaintiff argues that defendant is liable under agency, trust and restitution law for whatever benefit it obtained through inducing or participating in JKS's breach of its fiduciary duty to plaintiff. Inquiry notice of the likelihood of the breach, plaintiff asserts, is sufficient to impose a duty of restitution. *See Restatement (Second) Trusts,* § 297. Plaintiff contends that defendant knew, after cancellation of the agency agreement, that JKS was not receiving any premium dollars on defendant's policies and therefore also knew or should have known that the money JKS was paying it was from premiums on policies issued by other insurers, to whom the money rightfully belonged. However, the evidence does not support that theory. First, there is no evidence that defendant received or retained funds held for plaintiff. The funds in the trust account were commingled; the different underwriters did not require that they be earmarked for particular underwriters, and they were not. Although, as plaintiff emphasizes,

---

[4] The court informally consolidated this matter with *Industrial Underwriters v. JKS, Inc.,* 90 Or App 189, 750 P2d 1216, for the purpose of its memorandum opinion. The case is similar factually, and two of the parties are the same, although their roles in the two cases are different.

JKS was no longer selling policies for defendant, there is no evidence that the premiums paid to defendant came from funds received on insurance policies written for plaintiff rather than for defendant or some other underwriter.

Second, there is no evidence that defendant acted for the purpose of interfering with JKS's alleged fiduciary relationship with plaintiff. Defendant's right to seek payment from the account for the premiums due and owing to it is not disputed, and there is no contention that it received payment in excess of what it was owed. Even if defendant had been aware that JKS's trust account was not adequate to cover premiums owed to all underwriters, there is no evidence that defendant knew or should have known that, in pursuing its right to be paid funds due and owing by JKS, it would be inducing JKS to breach its fiduciary duty to plaintiff. The trial court properly granted summary judgment on the quasi-contract claim.

Plaintiff's claims for interference with business and contractual relations fail for similar reasons. Plaintiff contends that, because it can be inferred from the evidence that defendant knew that JKS did not have the money which it needed to pay all of its underwriters, it can be inferred that defendant induced JKS to pay defendant money that it knew to have been due other underwriters and held in trust for them, thereby causing JKS to breach its agency agreements with those underwriters, particularly plaintiff.

The development of the tort of wrongful interference with business or contractual relations is detailed in *Top Service Body Shop v. Allstate Ins. Co.*, 283 Or 201, 582 P2d 1365 (1978). The contemporary version of the tort is described as a wrongful interference which causes injury to the plaintiff's contractual or business relations. An interference is wrongful if it is carried out for some improper motive or by the use of an improper means. As we have said, the record on summary judgment contains no evidence that defendant acted for the purpose of causing JKS to breach its agreements with other underwriters, or with plaintiff specifically. Additionally, the evidence does not raise a question of fact as to whether defendant's motives or means were otherwise improper. Even if defendant knew that JKS could not pay all of its underwriters, that does not raise a question of fact as to the propriety of

defendant's motives. The only evidence is that defendant acted to collect premiums that plaintiff concedes were owed to it and that defendant had a right to collect. Any incidental interference with JKS's ability to pay its other underwriters is not actionable. *Wampler v. Palmerton,* 250 Or 65, 73, 439 P2d 601 (1968).[5] The trial court did not err in granting defendant's motion for summary judgment.

Affirmed.

---

[5] The interference claims fail on this record whether or not JKS stood in a fiduciary capacity to plaintiff.